Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| KEVIN COOPER, *Petitioner-Appellant,* v. JILL BROWN, California State Prison at San Quentin, *Respondent-Appellee.* | No. 05-99004 D.C. No. CV-04-00656-H Southern District of California, San Diego ORDER |

Filed May 11, 2009

Before: Pamela Ann Rymer, M. Margaret McKeown, and Ronald M. Gould, Circuit Judges.

Order;
Dissent by Judge W. Fletcher;
Dissent by Judge Wardlaw;
Dissent by Judge Fisher;
Dissent by Judge Reinhardt;
Concurrence by Judge Rymer

## ORDER

The panel has voted to deny the Petition for Rehearing and Petition for Rehearing En Banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to hear the matter en banc. The matter failed to receive a majority of the votes

of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for rehearing and the petition for rehearing en banc are DENIED.

---

W. FLETCHER, Circuit Judge, dissenting from denial of rehearing en banc, joined by PREGERSON, REINHARDT, PAEZ, and RAWLINSON, Circuit Judges:

The State of California may be about to execute an innocent man.

From the time of his initial arrest until today, Kevin Cooper has consistently maintained his innocence of the murders for which he has been convicted. Cooper was convicted of capital murder and sentenced to death by a California court in 1985. The California Supreme Court affirmed Cooper's conviction and sentence in 1991. *People v. Cooper*, 53 Cal. 3d 771 (1991). The California Supreme Court denied Cooper's state petition for habeas corpus in 1996. A three-judge panel of the Ninth Circuit affirmed the denial of Cooper's first federal application for habeas corpus in 2001. *Cooper v. Calderon*, 255 F.3d 1104 (9th Cir. 2001). That decision was called en banc, but the call failed.

In 2004, on the eve of his scheduled execution, Cooper sought permission from the three-judge Ninth Circuit panel to file a second or successive application for federal habeas corpus under 28 U.S.C. § 2244(b)(3)(A). Among other things, Cooper claimed that he had new and previously unavailable evidence that the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* requires the State to turn over exculpatory information to a criminal defendant. Based on the claimed *Brady* violation, Cooper claimed actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995), and

§ 2244(b)(2)(B)(ii). The three-judge panel denied permission, but an en banc panel of the Ninth Circuit reversed. *Cooper v. Woodford*, 358 F.3d 1117 (9th Cir. 2004) (en banc). We stayed Cooper's then-pending execution until his new federal habeas application could be addressed.

Two days before the murders, Cooper had escaped from the minimum security section of a nearby California state prison by walking across an open field. Shortly before Cooper's scheduled execution date, Midge Carroll, the now-retired warden of the prison, provided a sworn declaration in which she stated that she had learned from her staff that shoes issued to prisoners "were not prison manufactured or specially designed prison-issue shoes," but, rather, were "common tennis shoes available to the general public through Sears and Roebuck and other such retail stores." Carroll stated that she had learned this information during the investigation and conveyed it to investigators before the trial. This information would have been critical to Cooper's defense, for a key to the prosecution's case at trial was that identical shoeprints at the crime scene and in the house where Cooper had been staying were made by Pro-Ked "Dude" tennis shoes, and that these shoes were distributed only to prisons and other institutions. Warden Carroll's information, though clearly exculpatory, had not been provided to Cooper prior to trial.

In granting permission to file a second or successive application, the en banc panel noted, "Once a *Brady* violation has been established, a federal habeas court is required to evaluate all information in the case, not just information relevant to the *Brady* violation." *Cooper*, 358 F.3d at 1122. That is, everything in the new habeas application was properly before the district court. *Woratzeck v. Stewart*, 118 F.3d 648, 650 (9th Cir. 1997) (per curiam) ("If [a petitioner's] application makes a prima facie showing as to one of the claims, he may proceed upon his entire application in the district court."). In addition to this general instruction to the district court, we specifically directed that two tests be performed. We wrote, "As soon as

Cooper's application is filed, [the district court] should promptly order that these two tests be performed in order to evaluate Cooper's claim of innocence." *Cooper*, 358 F.3d at 1122.

First, we directed the district court to conduct further testing of a bloody tan t-shirt that had been found beside the road leading away from the house where the murders took place. The tan t-shirt was found soon after the murders. Initial testing of stains on the t-shirt showed that they contained blood consistent with one of the victims and not consistent with Cooper. Cooper presented evidence of the t-shirt as part of his defense at trial. 12/6/84 RT 4602-06, 4608; 1/15/85 RT 6508-11.[1]

Long after trial, at Cooper's insistence, the State performed a DNA test on some of the blood on the t-shirt. Cooper maintained that the test would prove his innocence. Instead, the blood tested positive for Cooper's DNA. Cooper maintained (and continues to maintain) that his blood was planted on the t-shirt. If the blood was planted, the only possible source was blood taken from Cooper by law enforcement authorities. A vial of blood was taken from Cooper by San Bernardino County Sheriff's Department (SBCSD) personnel on August 1, 1983, two days after his arrest. That blood contained an added preservative called EDTA. We wrote, "The presence of such a preservative would show that [Cooper's] blood was not on the t-shirt at the time of the killings[.]" *Cooper*, 358 F.3d at 1124. We directed the district court to test Cooper's blood on the t-shirt for the presence of EDTA.

Second, Jessica Ryen, one of the murder victims, was

---

[1]Citations to the reporter's transcripts of the trial and hearings appear with the date of the proceeding, the letters "RT," followed by the page number. Citations to the Excerpts of Record, compiled for purposes of this appeal, use the abbreviation "ER" followed by the page number. "FER" refers to the Further Excerpts of Record.

clutching blond or light brown hair in her hand. We directed the district court to subject the hair to mitochondrial DNA testing.

The district court held hearings on Cooper's application for habeas corpus in 2004 and 2005. It denied all relief. *Cooper v. Brown* ("Dist. Ct."), No. 04-656 (S.D. Cal. May 27, 2005).[2] A three-judge panel of our court affirmed, with one judge concurring specially. *Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007).

There is no way to say this politely. The district court failed to provide Cooper a fair hearing and flouted our direction to perform the two tests.

As will be described in greater detail below, the district court impeded and obstructed Cooper's attorneys at every turn as they sought to develop the record. The court imposed unreasonable conditions on the testing the en banc court directed; refused discovery that should have been available as a matter of course; limited testimony that should not have been limited; and found facts unreasonably, based on a truncated and distorted record.

The most egregious, but by no means the only, example is the testing of Cooper's blood on the t-shirt for the presence of EDTA. As will be described in greater detail below, the district court so interfered with the design of the testing protocol that one of Cooper's scientific experts refused to participate in the testing. The district court allowed the state-designated representative to help choose the samples to be tested from the t-shirt. The court refused to allow Cooper's scientific experts to participate in the choice of samples.

---

[2]The district court's order in this case is published as an appendix to the panel's opinion, *Cooper v. Brown*, 510 F.3d 870, 887-1004 (9th Cir. 2007). I refer to the pagination of the district court's order as it appears in that appendix.

Indeed, the court refused to allow Cooper's experts even to *see* the t-shirt. The state-designated lab obtained a test result showing an extremely high level of EDTA in the sample that was supposed to contain Cooper's blood. If that test result was valid, it showed that Cooper's blood had been planted on the t-shirt, just as Cooper has maintained.

A careful analysis of the evidence before the district court strongly suggests that the result obtained by the state-designated lab was valid. However, the court allowed the state-designated lab to withdraw the test result on the ground of claimed contamination in the lab. The court refused to allow any inquiry into the alleged contamination. The court refused to allow Cooper's experts to review the bench notes of the state-designated lab. The court then refused to allow further testing of the t-shirt, even though such testing was feasible.

The district court placed two photographs of the murder victims at the end of its 159-page order denying relief to Cooper. One is a photograph of the photogenic Ryen family — two beautiful children, ten-year-old brown-haired Jessica and eight-year-old blond-haired Josh, and their attractive parents. The other is a photograph of eleven-year-old Chris Hughes, a handsome blond-haired boy. The district court had no analytic reason to include these photographs at the end of its order.

## I.   Background

Late at night on June 4, 1983, Doug and Peggy Ryen, their daughter Jessica, and their houseguest Chris Hughes, were brutally murdered in the Ryen home in Chino Hills, California. Their son, eight-year-old Josh, suffered extensive injuries but survived. The victims had numerous chopping, cutting and stabbing injuries, caused by several different kinds of weapons. A number of cutting and stabbing wounds were inflicted after the victims were already dead. Josh was found

in the late morning of June 5 in his parents' bedroom, near the bodies of his mother and Chris. His father's body was also in the bedroom. His sister's body was in an adjoining hallway.

Two days earlier, Kevin Cooper, a black man, had escaped from the minimum security section of the nearby California Institute for Men (CIM) at Chino by walking across an open field. He had been serving a four-year sentence for burglary. Cooper hid out for those two days in a vacant house owned by Larry Lease (the "Lease house"), 125 yards from the Ryen house. The State's theory, at trial and now, is that Cooper acted alone in killing the four victims and in nearly killing Josh, and that Cooper committed the murders to facilitate his escape.

Cooper made several telephone calls from the Lease house, seeking money and other assistance from two women friends. The women refused to provide money or other help. Money in plain view on the kitchen counter of the Ryen house was untouched. Credit cards and money in Peggy Ryen's purse were also untouched.

The last of Cooper's telephone calls from the Lease house was completed at 8:30 p.m. on June 4, the night of the murders. Cooper testified that he waited until dark, finished his telephone call, left the house on foot immediately after the call, and hitchhiked to Mexico. There is undisputed evidence that Cooper registered at a hotel in Tijuana at 4:30 p.m. on June 5. When Cooper checked into that hotel, his hair was braided, as it had been when he escaped from prison. ER 3252, 3260. The Ryens' white wood-paneled station wagon had been parked in the driveway of the Ryen house, with the keys in the ignition, throughout the entire evening of June 4. On June 11, the Ryens' station wagon was discovered in the parking lot of a Long Beach church, where it had been for several days. Tijuana is 125 miles south of the Ryen house. Long Beach is 45 miles west of the Ryen house.

A.  Evidence Pointing to Other Killers

There is substantial evidence that three white men, rather than Cooper, were the killers. Some of the evidence was introduced at trial. Some of the evidence, even though exculpatory, was deliberately destroyed by the SBCSD and was therefore not available for use at trial. Some of the evidence, even though exculpatory, was concealed from Cooper and therefore not available for use at trial.

Josh Ryen, the only survivor of the attack, first communicated to SBCSD Deputy Sharp that the murderers were three white men. ER 1278-79, 1386-87. This statement was the likely source of an entry in the police log during the afternoon of June 5, stating that the suspects were "three young males" driving the Ryens' white station wagon. ER 3688.

On the night of the murders, a couple drove to Chino Hills from Los Alamitos (about 37 miles away) after the night horse races to drop off a horse trainer. As they were leaving the trainer's driveway, they had to wait for a car driving rapidly down Carbon Canyon Road from the direction of the Ryen house. The husband, who was driving, testified at trial that he stopped to wait for the car to pass. He stated that the car was a "light color" station wagon with a luggage rack. ER 1375-76. With some coaxing from Cooper's attorney, he admitted that shortly after the episode he had described the driver to SBCSD Lieutenant Knadler as a "young white male." The wife, who was a passenger, described the car as "tan" or "cream" colored, with "wood grain" paneling. She thought the car had a luggage rack. She "remembered thinking" that she saw three or four people in the car. ER 1379. The Ryens' station wagon was white with wood paneling and a luggage rack.

The injuries to the victims were consistent with the use of multiple weapons. The number of victims, and the number and nature of the wounds, led the coroner initially to conclude

that there was more than one killer. ER 1367-69; *see also* ER 3148-56.

When Josh was in the hospital after the murders, he twice saw a picture of Cooper on television. Both times he indicated that Cooper was not one of the killers.

On June 7, SBCSD Deputy Field recovered a blood-stained tan, medium-size, Fruit of the Loom t-shirt with a front pocket beside Peyton Road, not far from the Ryen house and the Canyon Corral Bar. ER 1575. The characteristics of the blood on the t-shirt were consistent with Doug Ryen's profile and inconsistent with Cooper's profile. ER 1757-61; 1/15/85 RT 6508-13. Post-trial DNA testing, conducted at Cooper's insistence, revealed that the shirt contained DNA consistent with Doug Ryen and possibly Peggy Ryen. ER 800. Post-trial DNA testing also revealed that at least one blood stain on the t-shirt contained Cooper's DNA. I discuss the presence of Cooper's DNA on the t-shirt in greater detail below.

As will be described in more detail below, a woman named Diana Roper provided a statement in 1983 and again in 1998 describing an identical tan Fruit of the Loom t-shirt with a front pocket that she had purchased for her then-boyfriend, Lee Furrow. On both occasions, Roper stated that Furrow was wearing the t-shirt on the evening of June 4. ER 1571, 1573.

At the time of the murders, Lee Furrow was living with Roper in Mentone, approximately 45 miles east of Chino Hills. ER 1570, 1592, 3142; 10/22/84 RT 2266. Furrow had previously been convicted of strangling Mary Sue Kitts in 1974, on the orders of Clarence Ray Allen. ER 1594, 1789-90, 1802; 10/22/84 RT 2266. Furrow had been a member of the "Allen gang," and he testified for the prosecution at Allen's capital murder trial. *See Allen v. Woodford*, 395 F.3d 979, 986, 991 (9th Cir. 2005); *People v. Allen*, 42 Cal. 3d 1222, 1236-38 (1987). Allen was executed in 2006. In return

for his testimony, Furrow was allowed to plead guilty to second degree murder. He served four and a half years in prison.

Furrow was released from prison on June 12, 1982, a year before the Ryen-Hughes murders. In a 1998 sworn affidavit, Roper stated that Furrow had "confided" in her that he "dismembered [Kitts'] body and threw the body parts in the Kern River." ER 1570. Kenneth Koon, another acquaintance of Furrow's, confirmed that he learned that Furrow "killed a girl, cut her up, threw her in the Kern River." Kenneth Koon Interview, Apr. 7, 2004, Docket No. 31, Ex. 55, at 4.

On June 4, the day of the murders, Furrow, Roper, Roper's sister Karee Kellison, and neighbors Michael and Rebecca Darnell, attended the U.S. Festival Country Show at the Glen Helen Amphitheater approximately 30 miles northeast of Chino Hills and 24 miles northwest of Mentone. *See* Answer, Docket No. 30, Ex. 36; *see also* ER 1786. That afternoon, Furrow picked up Michael Darnell from the county jail, where he had been held overnight. Answer, Docket No. 30, Ex. 39. ER 1786. According to Darnell, he and Furrow arrived at the festival after dark. Answer, Docket No. 30, Ex. 40 at 9, 16. Debbie Glasgow, who was having an affair with Furrow, told police that Furrow arrived at the festival at approximately 11 p.m. Answer, Docket No. 31, Ex. 53. Rebecca Darnell recalled that she left the festival with her husband, and with Roper and Roper's sister, but that Furrow did not leave with them. Answer, Docket No. 31, Ex. 41 at 1.

In her 1998 affidavit, Roper stated:

> On Saturday afternoon June 4, 1983, Lee [Furrow] and I were at our home getting ready to go to the US Festival. . . . He was wearing a medium size Fruit of the Loom beige T-shirt which had a pocket on the front. I bought Lee the T-shirt at K-Mart before June 4, 1983. I also recall telling the sheriff's department

fifteen years ago virtually the same thing regarding Lee's T-shirt. . . .

During the early morning hours of June 5, 1983, my sister Karee Kellison, and I had returned from the US Festival and were in the living room at my house in Mentone. I received a telephone call from Lee about 1:30 a.m. to 2:00 a.m. in the morning of June 5, 1983, asking me to come get him and Debbie Glasgow at the US Festival. I refused and hung up the telephone. A few hours later a car pulled into our driveway. My sister, Karee, walked to the French doors to look out. I did not look out. A few moments later Lee and Debbie walked through the front door. They were in a hurry. I heard the car depart. Lee was wearing long sleeve coveralls which had a zipper in the front. The coveralls were splattered with blood and there was horse hair and dried horse sweat on the lower leg area. He did not have the beige T-shirt or Levis on that he was wearing earlier in the day. Lee walked to the back of the house and seemed to be in a hurry. Lee took the coveralls off and left them on the floor of the closet. After he changed his clothes, Lee and Debbie left immediately on his motorcycle. Lee and Debbie were not in the house for more than five minutes and were obviously in a big hurry to leave.

After I learned of the Ryen/Hughes murders in Chino I turned the coveralls over to the San Bernardino County Sheriff's Department. I told the deputy the facts about how I found the coveralls and that Lee Furrow may be the murderer.

A few days after the murders I saw Lee at my neighbors house. . . . I told Lee I turned the bloody coveralls over to the sheriff's department. Lee became furious that I had turned them in. Lee had

changed his appearance by cutting most of his hair off and trimmed his sideburns and his "Fu-Manchu" moustache. . . .

Also, a few days after the murders I heard on the news that a hatchet was found near the crime scene in Chino. I immediately walked to the washer area of our house. Lee's hatchet was missing. All of his other tools were still hanging on the wall. [Referring to a photograph of the hatchet found near the crime scene]: The hatchet in this picture looks like the hatchet . . . which I found missing after the Ryen/Hughes murders. I cannot say for sure it is the same hatchet that Lee owned but the curvature of the handle is the same. Even more striking in similarity than the curvature of the handle is the style of the handle, which has sort of an American Indian pattern to it.

[Referring to a photograph of the bloody tan Fruit of the Loom t-shirt recovered near the Ryen house]: The T-shirt in this photograph looks exactly like the T-shirt Lee was wearing on June 4, 1983 including the manufacturer, the size, the color and the pocket. I am absolutely positive the photograph of this T-shirt matches the T-shirt that Lee was wearing at our house on the afternoon of June 4, 1983.

ER 1571-73. The substance of Roper's 1998 affidavit matches the substance of a May 1984 interview she gave to SBCSD Detective Stalnaker. In the interview, Roper told Detective Stalnaker that she had been under the influence of drugs on the night of June 4. ER 1588-97.

In a separate November 1998 sworn affidavit, Roper's sister Karee Kellison confirmed many of the details of Roper's story. She added a detail about the car in which Furrow and Glasgow arrived. She stated:

. . . During the early morning hours of June 5, 1983, [Diana and I] were in the living room talking when we heard a car pull in the driveway. I would estimate the time after 3:00 a.m. but before sunrise. I looked out the window in the French doors and I saw Lee and Debbie get out of a car. There was not sufficient light to identify who the other occupants in the car were. However, there was enough light to see that it was a station wagon, kind of brown in color. . . .

Lee and Debbie came in the house. Lee was wearing long sleeve coveralls, which were splattered with blood. Lee walked to the back of the house and changed his clothes. When he came out of the bedroom he was no longer wearing the coveralls and apparently left them in the back of the house. Lee and Debbie left immediately on his motorcycle. . . .

A week or so after the Ryen/Hughes murders I was interviewed by the police. I never told them the above information because I am terrified of Lee Furrow and Debbie Glasgow. I don't recall what I told the police but I know that I did not tell them what I saw for fear of what Lee and Debbie would do to me. While I am still scared to death of Lee, I understand he is in Pennsylvania and Debbie is dead.

ER 3116-17.

On June 9, Roper examined the coveralls that Furrow had left at her house on the night of the murders. She called her father, who then called the SBCSD. ER 1591, 4895. According to SBCSD Deputy Eckley, who was dispatched to Roper's house, the coveralls were "[h]eavily splattered" with blood. ER 1578. Deputy Eckley took the coveralls into evidence and gave a report to his supervisor. ER 1582. Deputy Eckley's report, dated June 10, 1983, stated that Roper "suspects that

the bloody coveralls are from the Chino murders and has further information regarding that incident and/or possible suspect/s." ER 3105. As will be recounted in more detail below, Deputy Eckley discarded the coveralls in a dumpster during Cooper's preliminary hearing in his capital case. Deputy Eckley claimed at trial that he acted alone in destruction of the bloody coveralls. However, the initials "KS" on the Disposition Report for the coveralls indicate that Senior SBCSD Deputy Ken Schneckengast approved the destruction. The State did not provide the Disposition Report to Cooper's attorneys until long after trial. There is no evidence that anyone in the SBCSD ever performed tests on the blood on the coveralls.

Deputy Eckley had had prior experience with Diana Roper and Karee Kellison, as well as with their father, Bill Kellison. Deputy Eckley's prior experience caused him to take seriously the coveralls and Roper's story. In an audiotaped interview with Cooper's investigator, Deputy Eckley stated, "[W]ith my relationship with the Kellison's/Roper family I know their involvement in crime, as far as committing murders as well as giving up murderers. . . . [T]hey've given very good information on a murder before." ER 5000-01.

Roper and Furrow separated immediately after the murders. Roper then began living with Kenneth Koon. ER 1592-93. In November 1984, Koon was incarcerated at the California Medical Facility at Vacaville. According to Anthony Wisely, another inmate at Vacaville, Koon confided in Wisely while they were in lockdown smoking marijuana. SBCSD Detective Woods interviewed Wisely on December 19, 1984. Detective Woods stated in his report that Wisely was in prison "for a two-year period of time under the psychotic and remission program." ER 1601. Part of Wisely's story directly recounts the murders. Another part of the story matches Roper's story if Furrow's name is substituted for Koon's. According to Detective Woods' report:

[Wisely said that Koon told him] that he was with two other guys that were in the BRAND or Arian [sic] Brotherhood and they [had] driven to the Chino area to collect a debt. He also stated that they had driven to a residence in Chino and that the two guys got out and that they were in for about ten or fifteen minutes and that one of the guys was carrying two axes or hatchets. That he also had gloves on, and that one of them made the statement that the debt was officially collected and that the first guy that came out turned around and said who was that, and then again stated "Who the fuck is the nigger?" He said that the man that made the statement was looking in the direction of the window and he saw a black subject through the window and the one subject told him to get out of there. He states that KOON was dropped off in San Bernardino somewhere, he does not know where. He stated that KOON went to his old lady's house and changed his overalls and that KOON also made the statement that one of the guys that came out with the axes was very upset because they apparently had left one kid alive.

. . . .

He stated that these persons that apparently collected the debt at the Ryen residence are debt collectors for the BRAND, the Arian [sic] Brotherhood, and that they have been to the pen for murder before and it also includes or involves someone that is currently on death row.

He also stated that KOON thinks that they hit the wrong house for the collection and that after all this blows over that the BRAND will take care of business in the right way.

I asked WISELY about any details when they saw the black subject there in Chino. He stated he could not tell me any other details.

. . . .

. . . I asked [Wisely] if the female's name, which KOON referred to as his old lady, was DIANNA [sic] ROPER. He said that it was.

ER 1599-1600.

Detective Woods interviewed Koon immediately after his interview with Wisely. Koon confirmed Wisely's account about the coveralls. However, he clarified that it had been Furrow who had changed his coveralls at Roper's house. Woods wrote:

I asked [Koon] if he knew a subject by the name of DIANNA [sic] ROPER. He stated that he did. . . . I asked him at that time does he recall an incident when she turned over some coveralls to Yucaipa authorities. He stated that he did. He stated the best of his recollection was that she found some bloody coveralls in a house apparently belonging to LEE FARRELL [sic] and this was directly after the murders were discovered in the Chino Hills. He stated that apparently the cops destroyed them or lost the coveralls and nothing else was ever heard of it.

In the interview with Detective Woods, Koon provided himself an alibi. He claimed that he had not gone to the music festival with Furrow and Roper. Woods wrote, "He stated that he was aware of that particular weekend with the country music but, however, he was in the Gorman, CA area, returning back to the San Bernardino area shortly thereafter." Koon told Detective Woods that he was not affiliated with the "Arian

Brotherhood." He refused to answer further questions "about that Arian Brotherhood situation." ER 3114.

Even though Woods interviewed Wisely and Koon on December 19, the State did not provide the information to Cooper's attorney until the morning of January 2, the day Cooper was scheduled to take the stand at his capital trial. Cooper's investigator interviewed Wisely ten days later, on January 12. According to the investigator, Wisely was "wary." He was initially unwilling to talk to the investigator, but finally said a little. The investigator reported:

> Wisely stated that the contact by the Det[ective] was the beginning of his troubles, that he has been "in the hole" ever since. He reported that he had not committed a violation, and he is in the hole without cause. He further stated that the state is worried about him[.] . . . He then stated that he knew that Kevin Cooper did not do it, that "if you had been there & listened to him (Koon), you would know who did it" (or something close to those exact words).

ER 3119.

In 2004, when the district court was making its initial plans for mitochondrial DNA testing of the hairs in Jessica's hand, the California Deputy Attorney General informed the court that Furrow had retained an attorney. Through his attorney, Furrow declined to provide a hair sample. 6/2/04 RT 5. The Deputy Attorney General informed the court that Koon, on the other hand, "indicated he will provide whatever the Court would request, voluntarily." *Id.* at 5. According to Koon's story, as recounted to Wisely and recorded by Detective Woods, Koon stayed in the car while the other two men went inside with their axes. If this is true, Koon would of course have nothing to fear from providing a hair sample.

On the night of June 4, three men came into the Canyon Corral Bar, which is located near the Ryen house. Several employees testified at Cooper's trial that the men came into the bar sometime around 8 or 9 p.m., left, and returned later. Witnesses' estimates of the time of their return range between 11 p.m. and 1:00 a.m. *See* ER 3648. When the men returned, at least one of them was extremely inebriated. The bouncer, Ralph Land, did not testify at trial, but stated in a tape-recorded interview with Cooper's investigator in January 1984 that "two of them were really close-cut hairs and all that and then the other one had long, straggly like dirty, like I thought maybe they just a couple of Marines and they ran into an old buddy or something." ER 3616. The witnesses who testified at trial stated that all three of the men had close-cut military haircuts.

In 2004, the district court heard testimony from two women — Christine Slonaker and Mary Wolfe — who were in the bar on the evening of June 4 and were harassed by two or three men. These women, who had not previously provided testimony, remembered the evening in some detail. They testified in the district court that they were at the bar with a third friend, and that the friend was receiving unwanted attention from some men due to her low-cut blouse. Slonaker, a phlebotomist (a person who draws blood), noticed that the man who was most aggressive had blood all over him. 6/28/04 RT 7, 24-25. She stated that from a distance it looked like he was just dirty, but that as he got closer "it was clearly apparent that it was blood." *Id.* at 70. Slonaker only noticed two men, while Wolfe noticed three, but Wolfe also noted that the third man was "pretty quiet and standoffish." *Id.* at 121-22. She also noticed that they were "definitely [wearing] tennis shoes[.]" *Id.* Wolfe stated that the man who was not wearing coveralls had "medium brown or dirty blond hair that was longer than average and tucked behind his ears." ER 3219. Wolfe also noticed that the man in the tan shirt had spots of blood on his shirt and a small bit of blood on his face. 6/28/04 RT 121-23. Wolfe recalled that at least one of the others was

wearing coveralls partly zipped down. *Id.* at 121-22. The louder man in the coveralls also had blood on him. ER 3220. Slonaker noted that "they were saying really weird and gibberish kind of things. . . . They were kind of like their eyes were rolling in their head." 6/28/04 RT 23. When Slonaker told the man that he was covered in blood, he acted surprised and then his behavior changed. *Id.* at 24-25. Both women recalled that the men were asked to leave the bar. *Id.* at 72, 76, 79, 125.

Lance Stark, a regular at the bar, also testified for the first time in 2004. He described "a couple of young loud mouths" being rude to some women at the bar. 7/23/04 RT 20-21, 59. He also commented that the third man in the group was very quiet and not noticeable. *Id.* at 40. He described the men as scruffy looking or dirty looking, and he observed that one of the men looked like he had grease or mud on him. *Id.* at 22-24, 60, 62, 63. He recalls one of the women telling that man that he had something on him. *Id.* at 108-09.

Stark also testified that in early 2004 he was visited by someone he believed was associated with law enforcement. He testified that a man in a white Crown Victoria (which is often a law enforcement vehicle) pulled in front of Stark's trailer, asked whether he was Lance Stark, told him it would be in his best interest not to talk about the Kevin Cooper case, and then drove off. *Id.* at 30-32. Stark testified that the car was distinctive because it had a computer sticking out from the dashboard. *Id.* at 32-34. This visit occurred soon after one of Cooper's investigators first visited Stark. *Id.* at 90. When Cooper's attorney met Stark after his encounter with the man in the white Crown Victoria, Stark said, "Well, I'm not sure if I should talk to you because I was told not to." *Id.* at 101. The district court denied Cooper's efforts to investigate what may have been witness intimidation. ER 4037-39, 4663-65.

## B. Evidence Against Cooper at Trial

It was undisputed at trial that Cooper walked away from the minimum security section of CIM in Chino on June 2. It was

also undisputed that Cooper spent two days hiding in the Lease house, located about 125 yards from the Ryen house. Telephone records show that Cooper's last telephone call from the Lease house ended at about 8:30 p.m. on June 4, the night of the murders.

In addition to the above, the most important evidence against Cooper at trial was the following:

(1)    Eyewitness testimony of Josh Ryen.

(2)    A spot of blood on the hallway wall of the Ryen house that was consistent with Cooper's blood profile.

(3)    A bloody shoeprint made by a Pro-Ked Dude shoe on a sheet in the master bedroom of the Ryen house, a matching shoeprint on a spa cover outside the Ryen house, and another in the pool room at the Lease house.

(4)    Role-Rite prison-issue cigarettes and tobacco found in the Lease house and in the Ryens' abandoned station wagon.

(5)    A missing hatchet from the Lease house, and a hatchet sheath found on the floor of a bedroom in the Lease house.

(6)    A button found in the Lease house that matched a prison-issue jacket.

(7)    An empty beer can in the field between the Ryen house and the Lease house.

(8)    Burrs on Jessica Ryen's nightgown.

(9)    Positive Luminol tests in a shower in the Lease house.

I discuss each piece of evidence in turn.

### 1.   Eyewitness Testimony of Josh Ryen

At trial, the jury heard two recorded statements by Josh, one stating and one suggesting that he saw only one man on the night of the attack. However, when Josh first arrived at the hospital, he was able to communicate to a clinical social worker that the assailants were three or four young white males. Deputies misrepresented his recollections and gradually shaped his testimony so that it was consistent with the prosecution's theory that there was only one killer.

### 2.   A-41: The Spot of Blood in the Hallway

A single drop of blood in the hallway outside the Ryen master bathroom — several feet away from any of the victims — had characteristics consistent with Cooper's genetic profile and inconsistent with the victims'. The crime lab conducted serological testing of this blood drop (entered into evidence as A-41) under suspicious circumstances. The criminologist who conducted the testing arrived at one result, and then altered his records to show a different result that conformed to Cooper's known blood characteristics. The drop of blood has a history of being "consumed" during testing and then inexplicably reappearing in different form for further testing when such testing would prove useful to the prosecution.

### 3.   Pro-Ked Dude Shoeprints

Within the first few days after the murders, deputies discovered two distinctive matching shoeprints tying the crime scene to the Lease house. Later, a deputy in the crime lab discovered a bloody shoeprint on a bedsheet that had been collected from the Ryen master bedroom. At trial, the prosecution presented evidence that the shoe that likely made those shoeprints — a Pro-Ked Dude tennis shoe — was nowhere available for retail sale and was only available

through institutions such as CIM. The prosecution also presented evidence that Cooper had been issued such shoes at CIM.

The shoeprints on the sheet in the master bedroom of the Ryen house, on the spa cover outside the Ryen house, and in the Lease house were discovered after a suspicious delay. The shoeprint on the sheet was not discovered at the Ryen house, but rather in the SBCSD Crime Laboratory. Deputy Stockwell testified that he discovered the print after re-folding the sheet in the lab to match the way it supposedly had been folded, or crumpled, on the floor of the bedroom. 11/19/84 RT 3506-07. Deputy William Baird was the manager of the lab where the sheet was kept when the shoeprint was discovered. Baird provided critical testimony at trial connecting the shoeprint on the sheet to the shoeprint in the Lease house. He also testified that the shoeprints were made by Pro-Ked Dude shoes. ER 1676-77, 3195-3201. He testified that he already had a Pro-Ked Dude shoe in his lab, which he matched to the print on the sheet.

Pro-Ked Dude shoes were manufactured and distributed by Stride-Rite Corporation. Deputy Baird admitted at trial that he might have told the Stride-Rite official who testified at trial that the SBCSD wanted information from him so they could "shut down certain defenses." ER 3200. Soon after Cooper's trial, Baird was caught stealing heroin from the evidence locker at the Crime Laboratory. He stole the heroin both for his personal use and to sell to drug dealers. ER 1714-16.

Two additional facts discovered after trial render the shoeprint evidence particularly dubious. First, Pro-Ked Dudes were, contrary to the testimony at trial, available (though not in large quantities) at retail stores in the United States. Second, an inmate who testified at trial that he had issued Pro-Ked Dudes to Cooper shortly before his escape recanted his trial testimony in a sworn declaration supporting Cooper's application to file his second habeas application.

#### 4. Cigarettes and Tobacco

Cooper admitted to smoking "Role-Rite" prison-issue tobacco while he was in the Lease house. Tobacco consistent with Role-Rite was found on the floor between the front passenger seat and the front passenger door of the Ryens' station wagon. Two cigarette butts were also found in the station wagon, and blood typing tests could not exclude Cooper as the donor of the saliva on the butts. One of the butts contained tobacco that was consistent with the characteristics of the Role-Rite brand.

The station wagon was discovered in a parking lot in Long Beach, 45 miles west of the Ryen house, on June 11. When the station wagon was discovered, dust prints indicated that someone had recently closed the hood. ER 808-09. Cooper arrived in Tijuana, 125 miles south of the Ryen house, at 4:30 p.m. on June 5, the day after the murders, and stayed continuously at the same Tijuana hotel until June 8. 1/7/85 RT 5874. Cooper then went to Ensenada, Mexico, where he found work on a private boat. He worked on the boat from June 8 until the day of his arrest. 1/3/85 RT 5468-75. The station wagon was processed by the police under suspicious circumstances. Some cigarette butts from the Lease house were never processed into evidence. Some of those cigarette butts could have easily been planted in the car. Moreover, after initial forensic testing, paper from a hand-rolled cigarette butt supposedly found in the station wagon was described as consumed. That same paper later "reappeared" and was offered into evidence. When the paper "reappeared," it was significantly larger than the paper in the cigarette butt that had been tested.

#### 5. The Missing Hatchet and the Hatchet Sheath

On the day the bodies were discovered, detectives recovered a bloody hatchet beside the road not far from the Ryen house. People who had previously used the Lease house testified that a similar hatchet was now missing from the house.

Investigators found a sheath for the hatchet in the Lease house near the closet in the bedroom previously used by Kathleen Bilbia ("the Bilbia bedroom"), where Cooper had slept on June 3. Fingerprint evidence strongly suggests that the hatchet sheath was planted in the bedroom soon after the hatchet was discovered. Further, the owners of the hatchet provided inconsistent testimony about the location of the hatchet before it disappeared.

### 6. The Camp Jacket Button

Deputies discovered a green, blood-stained button near the closet in the Bilbia bedroom. It resembled buttons found on certain "camp jackets" issued at CIM. The blood on the button was type A, consistent with Cooper and Doug Ryen. The green button was discovered under the same suspicious circumstances as the hatchet sheath, strongly suggesting it was planted in the Bilbia bedroom after Cooper had become a suspect. Further, its color showed that it came from a green prison-issued jacket. Uncontradicted evidence at trial showed that Cooper was wearing a brown or tan prison-issued jacket when he escaped.

### 7. The Empty Beer Can

In the refrigerator in the Ryen house, there was a six-pack of Olympia Gold beer with one can missing. Another can in the refrigerator, as well as the wall of the refrigerator, were smudged with reddish stains. Deputies found a stained, nearly empty can of Olympia Gold in the field between the Ryen house and the Lease house. The stain on the can in the field and on the wall of the refrigerator tested positive for blood. The blood stains on the beer cans were so degraded that the lab could not conduct any further tests, and deputies failed to collect the stain on the wall of the refrigerator as evidence. No one analyzed the contents of the nearly empty beer can.

### 8.    Burrs on Jessica Ryen's Nightgown

Two burrs adhered to the inside of Jessica Ryen's nightgown approximately ten inches up from the bottom hem. The prosecution argued to the jury that because the top of Jessica's nightgown did not have holes corresponding with some of Jessica's post mortem chest wounds, at some point an assailant must have raised Jessica's nightgown, and, in the process of inflicting those chest wounds, deposited the burrs. The prosecution also presented evidence that similar burrs were found on the inside of the Ryen station wagon and on a blanket found in the closet where Cooper slept on June 3. Plants producing the burrs grew in the field between the Ryen house and the Lease house.

The plant that produces the burrs is common in Chino Hills. It is a relative of alfalfa and is a common ingredient in horse and cattle feed. It is unusual for such burrs to transfer from one fabric surface to another. Once the burrs have adhered to a surface, typically they must be physically plucked in order to be removed. 2/4/85 RT 7483-85, 7576-77. Moreover, the coroner found a small beetle in Jessica's body bag. This beetle is nocturnal, suggesting that Jessica may have been outside during or soon before the murders, when she could have picked up the burrs.

### 9.    Positive Luminol Tests in the Shower in the Lease House

Detectives tested the shower and sink in the bathroom adjoining the Bilbia bedroom in the Lease house for traces of blood. Luminol testing revealed the possible presence of blood on the shower walls in a broad band from approximately two feet to five feet above the floor of the shower.

When Kathleen Bilbia moved out of the Lease house a short time before the murders, she had cleaned her bathroom with bleach. Bleach reacts with Luminol in the same way that

blood does. In order to exclude the possibility that a Luminol reaction is caused by bleach, rather than blood, a two-stage test is required. The evidence suggests that the detectives only conducted a one-stage Luminol test. Moreover, the staining pattern in the shower is not consistent with a person cleaning up after being covered in blood. The Luminol test did not indicate blood in the bottom portion of the shower, and it did not reveal patterns of drainage in the shower. One would expect the blood rinsed from a person's body to travel downward in the shower, rather than moving horizontally in a broad, uniform, 3-foot horizontal band. Hence, the Luminol reaction in the shower is probably attributable to Bilbia's cleaning materials, not to the presence of blood. There was no indication that any bloody clothing was placed anywhere in the vicinity of the shower.

## II.    Discussion

Cooper advances several claims in his current habeas application. In my view, two of them are meritorious. I mean "meritorious" in a special sense. In part, I mean that they appear to be meritorious on the current record. In part, I also mean that if the district court had done its job — including performing the EDTA test on Cooper's blood on the tan t-shirt as we directed it to do — the likelihood of their being meritorious would be much higher.

First, Cooper claims that the State presented false evidence at trial, in violation of *Mooney v. Holohan*, 294 U.S. 103 (1935), and *Napue v. Illinois*, 360 U.S. 264 (1959). Second, Cooper claims that the State failed to reveal exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Under both claims, Cooper claims actual innocence under *Schlup v. Delo*, 513 U.S. 298 (1995). I discuss the two claims in the following sections.

### A.    Presentation of False Evidence

When we granted Cooper permission to file his second or successive habeas application in 2004, we specifically

directed the district court to test Cooper's blood on the tan t-shirt "for the presence of the preservative EDTA." *Cooper*, 358 F.3d at 1124. The purpose of the test was to determine whether Cooper's blood had been planted on the t-shirt. Judge Silverman stated the importance of the test: "Cooper is either guilty as sin or he was framed by the police. There is no middle ground." *Id.* (Silverman, J., concurring in part and dissenting in part).

I begin my discussion of Cooper's claim that the State presented false evidence with discussion of the EDTA testing. I do not do so because such testing will reveal directly whether the State presented false evidence during trial. The State did not put the t-shirt into evidence at trial. Rather, Cooper introduced it into evidence because the State could not show that any of Cooper's blood was on it. Thus, even if state actors did plant Cooper's blood on the t-shirt, the State did not thereby present false evidence at Cooper's trial. If state actors did plant Cooper's blood on the t-shirt, they likely did so long after trial — after DNA technology became available and after Cooper requested that DNA testing be performed on the t-shirt.

Nonetheless, for two reasons, I begin with a discussion of the EDTA testing. First, if state actors planted Cooper's blood on the t-shirt, this raises a very powerful inference that numerous pieces of evidence presented at trial were also planted by state actors. Second, if state actors planted this evidence, its presentation at trial violated Cooper's due process rights under *Mooney* and *Napue* and is the basis for a claim of innocence under either *Schlup* or 28 U.S.C. § 2244(b)(2)(B).

### 1. Testing for EDTA

The district court was hostile to our direction to perform EDTA testing on the t-shirt. In its order, the district court wrote, "Based on the last-minute representations made by

Petitioner regarding scientific testing capabilities, the en banc panel of the Ninth Circuit concluded [that the district court should order EDTA testing]." Dist. Ct., 510 F.3d at 932. In discussing the EDTA tests during a hearing, the district court stated orally, "But the en banc panel didn't get it." 6/3/04 RT 74. Whether as a result of its hostility to the EDTA testing or for some other reason, the district court failed to comply with our direction to perform the testing.

### a. *Daubert*

As a threshold matter, the district court concluded, incorrectly, that EDTA testing failed the test of admissibility under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). The court wrote that "the ubiquity of EDTA in the environment prevents any meaningful interpretation of the *significance* of an 'elevated' level of EDTA within a forensic sample." Dist. Ct., 510 F.3d at 941 (emphasis added). The court found that EDTA testing was therefore not reliable. *Id.* at 943-46. The court's exclusion of EDTA evidence under *Daubert* was based on an error of law, and therefore constituted an abuse of discretion. *See United States v. Morales*, 108 F.3d 1031, 1035 & n.1 (9th Cir. 1997) (en banc).

The district court confused the reliability of EDTA testing, the first prong of the *Daubert* analysis, with the issue of what that testing can prove, the second prong of the *Daubert* analysis. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (describing the two prongs of the *Daubert* analysis). It was uncontested at the 2004-2005 hearing in the district court that laboratory testing can reliably determine the amount of EDTA in any given sample. The district court found that "the levels of EDTA in the T-shirt were accurately measured" by Cooper's expert, Dr. Ballard. Dist. Ct., 510 F.3d at 941. The first prong of *Daubert* was thus satisfied.

The only contested issue was the second prong — what the presence of EDTA proved or tended to prove. The district

court rejected Dr. Ballard's testimony because it erroneously concluded that his measurements, even though accurate, did not satisfy the second prong of *Daubert*. *See* Dist. Ct., 510 F.3d at 941 ("Lacking any evidence to show that EDTA testing is a *reliable means of determining whether a blood sample has been planted*, the Court concludes that Petitioner's EDTA evidence fails the *Daubert* test." (emphasis added)).

It is hornbook law that evidence is admissible under *Daubert* if there is an accepted scientific method for making a reliable measurement, even if the evidentiary significance of the measurement can be disputed. *See Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). For example, courts (including the trial court in this case) regularly admit evidence of Luminol testing for the presence of blood, even though Luminol does not indicate the origins of the detected blood. In fact, Luminol does not even definitively prove the *presence* of blood. As noted above, other common substances, including bleach, also react with Luminol. 11/ 14/84 RT 3142, 3169-70. The district court in this case repeatedly referred to the results of Luminol testing as probative of Cooper's guilt. Dist. Ct., 510 F.3d at 907-08, 909, 910, 957. EDTA test results, like Luminol test results, satisfy the second prong of *Daubert* because they "logically advance[ ] a material aspect of [Cooper's] case." *See Daubert*, 43 F.3d at 1315.

The district court concluded that even if EDTA testing were admissible under *Daubert*, the results of the tests in this case do not support Cooper's contention that his blood was planted on the t-shirt. Dist. Ct., 510 F.3d at 948. I disagree. In the following two sections, I discuss errors committed by the district court in conducting the EDTA tests and in refusing to continue that testing. I then discuss the information revealed by the testing so far conducted, and show that even the truncated EDTA testing strongly suggests that Cooper's blood was planted on the t-shirt.

### b.   Errors by the District Court

In conducting the EDTA tests, the district court made six fundamental errors.

First, the district court refused to allow any of Cooper's experts to assist in choosing the portions of the t-shirt to be tested. Indeed, the court refused to allow Cooper's experts even to *see* the t-shirt.

Second, the district court refused to allow any testing of the samples chosen in order to determine whether the stains on the samples were actually blood stains.

Third, the district court refused to permit discovery into why blood from vial VV-2 — the blood taken from Cooper two days after his arrest — contained the DNA of two different people. One obvious explanation is that someone removed some of Cooper's blood from the vial and then added someone else's blood to conceal the fact that he or she had removed Cooper's blood.

Fourth, when the state-designated laboratory came back with a result of an extremely high level of EDTA in the sample supposed to contain Cooper's blood, thereby indicating that the blood had been planted, the lab director withdrew his results because of unspecified "contamination" in his lab. The district court refused to permit Cooper's attorneys to see the lab's raw data or notes, thereby preventing an inquiry into whether, in fact, there had been contamination, and into the significance of such contamination.

Fifth, the district court erroneously concluded that several samples from the t-shirt were proper "controls" when, in fact, they were not. These samples contained both human DNA and EDTA, which indicated that they likely contained blood that had been planted on the t-shirt. Because the district court erroneously concluded that these samples were proper con-

trols, it erroneously disregarded the test results obtained by the two laboratories.

Sixth, when the district court concluded that the results of the EDTA testing were inconclusive, it refused to permit more testing, even though such testing was feasible.

I discuss each of these errors in turn.

### i. Refusal to Allow Cooper's Experts to Assist in Choosing Portions of the T-shirt to Be Tested

One of Cooper's experts, Dr. Peter DeForest, repeatedly sought to participate in the process of examining the tan t-shirt and determining which parts of the t-shirt might be suitable for sampling. On August 4, 2004, Dr. DeForest filed a declaration noting that "new cuttings" of the t-shirt would be needed to perform the testing. He wrote, "[I]t is essential that the T shirt be inspected in person to select the areas to be sampled by cutting as well as those to serve as suitable control areas." ER 4021. On September 4, he wrote a letter to the district court, stating that he was concerned about the testing protocol that had been developed. He wrote:

> This protocol was generated without significant input from me. I feel this protocol is flawed. I will not agree [to] do any sampling according to this protocol. It will not be possible to obtain any meaningful quantitative results using it. . . .
>
> . . . Once I have examined the shirt, I am willing to design an approach for review by another scientist or develop one in conjunction with a criminalist representing the prosecution. As I have been trying to explain for some time now, there needs to be a careful assessment of the shirt followed by a scientific consensus on the pre-extraction sampling. . . .

> The samples need to be taken in such a way that it is possible to relate any quantitative findings [of EDTA levels] to a specific amount of bloodstain. This is not possible with the protocol specified in the order. In addition, there is the possibility that a scientific consensus might be that sampling that would allow a meaningful result is simply not possible. In such a case, samples should not be taken.

ER 4128-29.

The response of the district court was to exclude Dr. DeForest. On September 7, three days after the date of Dr. DeForest's letter, the district court ordered that the t-shirt be sent to Dr. Lewis Maddox of the Orchid Cellmark laboratory. Dr. Maddox's laboratory is not associated with either Cooper or the State. The court directed Dr. Maddox and Gary Sims (or Sims' designee) to prepare "Area 6G" of the t-shirt for testing, and to select other portions of the t-shirt for use as controls. ER 4151. Mr. Sims is Director of the California Department of Justice Laboratory. The court's order did not allow a representative of Cooper to be present during the selection process.

Dr. DeForest was prescient. Area 6G of the t-shirt (the area specified in the court's order) was the area that had been originally tested for DNA. That earlier testing had confirmed Cooper's blood was present in Area 6G. Upon close inspection by Dr. Maddox, Area 6G turned out to be unsuitable for further testing because there was no blood remaining in that area. The State notified the district court of this fact on September 13.

That same day, Cooper's lawyer wrote to the district court, "[M]ost importantly, Petitioner vigorously requests that an expert of his be allowed to inspect the T-shirt and be part of the selection and preparation process for the anti-coagulant [EDTA] testing." ER 4205. At 5:30 p.m. that same day, the

district court denied Cooper's request to have a representative present during the selection and preparation process. The court wrote, "The court denies petitioner's request to have his own observer present at the preparation of the T-shirt for the EDTA testing. The court acknowledges that the 6-G stain is not suitable for testing. The court orders Dr. Maddox, in consultation with Dr. Myers [Mr. Sims' designee, the State's representative], to select an appropriate stain area and prepare it for EDTA testing[.]" ER 4207.

As a matter of due process, a court is required to allow both sides to participate when important decisions are made. Where, as here, serious objections were made to the manner of choosing and processing samples to be tested, the district court failed in its duty to provide a fundamentally fair process.

### ii.  Refusal to Allow Testing of the Newly Chosen Sample for the Presence of Blood

Dr. Maddox and Mr. Sims' designee, Mr. Myers (the district court erroneously referred to him as Dr. Myers), chose an area of the t-shirt between stains labeled 6J and 6K as a replacement for Area 6G. In their view, this area was likely to contain Cooper's blood. They therefore took their sample from this area. They then divided the sample into three pieces. They sent one of the pieces to the state-designated lab, sent one to Cooper's designated lab, and retained the third piece at Dr. Maddox's lab. However, no one tested the new sample (or any part of it) to determine if any of the three pieces actually contained blood.

Cooper objected to the failure to test the newly chosen sample for blood. He specifically requested that it be tested to determine if it contained blood. The district court denied the request on the ground that Cooper had not previously requested testing of the sample for the presence of blood. *See* 4/22/05 RT 10-11, 57-58, 171-72; *see also* Dist. Ct., 510 F.3d

at 935 n.16. The district court's refusal to test the newly chosen sample for the presence of blood was wrong on two counts.

First, the district court was wrong procedurally. It was unfair to fault Cooper for not having previously requested testing of the sample for blood. Up until September 13, Cooper reasonably assumed that the sample to be chosen for testing would come from the stain in Area 6G, which everyone believed contained Cooper's blood. It was therefore unnecessary to request testing of a sample from Area 6G for the presence of blood. Such testing only became necessary when a new sample was chosen. After Area 6G was deemed unsuitable, even the *State* told the district court that additional testing of the new subject sample "would be required to determine whether Cooper's blood is actually present in the stain." ER 4194. Cooper had no reason specifically to request this additional testing after the State said that it was "required."

Second, and more important, the district court was wrong substantively. Because of the failure to test the new sample for the presence of blood, it was possible that, as intended by the protocol, all of the pieces of the new sample sent for EDTA testing had Cooper's blood. But it was also possible that one or more of the pieces had none of his blood. This second possibility was greatly enhanced for the new sample, as compared to the old one from Area 6G. The new sample was adjacent to Area 6G, and therefore Dr. Maddox and Mr. Myers assumed that it contained Cooper's blood. But it was unclear how far into the new sample Cooper's blood extended (if indeed his blood extended into the new sample at all). Further, the new sample was both larger and more irregularly shaped than the old sample, making it even more likely that any blood on the sample was not evenly distributed throughout the entire sample.

As I discuss below, these characteristics of the new sample may well account for the radical difference obtained by the

two labs in testing their pieces of the sample. The State-designated lab found an extremely high level of EDTA in its piece. The Cooper-designated lab found an elevated but lower level of EDTA in its piece. This disparity could well have happened because the state-designated lab tested a piece that contained Cooper's blood, and the Cooper-designated lab tested a piece that did not contain his blood, or contained considerably less of it. If the district court had permitted testing of the new sample for blood — and, specifically, Cooper's blood — we would know the answer.

### iii.   Refusal to Permit Inquiry into Why Vial VV-2, Which Should Have Contained Only Cooper's Blood, Contained the DNA of Two or More People

On August 1, 1983, two days after Cooper's arrest, two SBCSD criminalists drew Cooper's blood. They put that blood into a vial labeled VV-2. The vial contained the preservative EDTA. In 2004, during the court-ordered testing of the hairs Jessica clutched in her hand,[3] the State made a mistake. It inadvertently sent a card containing blood from vial VV-2 to Dr. Terry Melton, the expert charged with testing the hairs. ER 3187. This was the first time since 1983 that any non-State personnel had been permitted to see or test blood from vial VV-2.

Dr. Melton tested the blood from VV-2, unaware of the fact that the State had not intended to send it to her. Dr. Melton found that the blood from VV-2 contained the DNA of two or more people. This was a truly startling finding. On August 2, 2004, Dr. Melton informed the court of her finding. ER 5645.

---

[3]I do not pursue the argument here, but there is ample reason to conclude that the district court also disregarded our directive by unduly limiting the mitochondrial DNA testing of the hairs in Jessica Ryen's hand and by prematurely foreclosing the opportunity for further testing.

Vial VV-2 originally contained only Cooper's blood, and should have continued to contain only Cooper's blood. The most logical explanation for the finding is that someone added another person's blood to the vial. Why might that have been done? One explanation is that someone took some of Cooper's blood out of the vial for some purpose (planting it on the t-shirt?), and wanted the vial to appear as full as it previously had been. In order to accomplish that, he or she had to add someone else's blood to the vial to bring it back up to the proper level.

On August 4, Cooper's lawyer raised Dr. Melton's discovery with the district court. Perhaps the court thought Cooper's lawyer was speaking of DNA from the hairs. The court stated, "[W]e never expected that it was going to be Cooper." 8/6/04 RT 138. Counsel replied, "[I]t is not the hairs that were sent that we're talking about. It is the known sample that was sent, and that's been contaminated. And there is a very serious issue about that." *Id.* at 139.

On September 10, Cooper moved for an evidentiary hearing, inter alia, "to determine the cause for the appearance of a 'mixture' of DNA in Petitioner's blood sample also submitted to Dr. Melton." He wrote:

> VV-2 is the blood sample collected from Petitioner at the time of his arrest[.] . . . [The] [b]lood sample should only have contained Petitioner's DNA[.] . . . Dr. Melton's report reveals that a mixture of DNA sources was detected in VV-2. . . . In light of prior evidence presented by Petitioner regarding tampering or contamination of biological evidence in this case, Dr. Melton's findings regarding VV-2 are extremely alarming and mandate further inquiry.

ER 4168. On February 3, 2005, the district court denied Cooper's motion. It did not mention vial VV-2 in its order.

On April 22, 2005, in final oral argument to the district court, Cooper's counsel returned to the subject of the blood in vial VV-2. He said, "[W]ith regard to VV-2, I just want to be — make this clear. There seems to be a possible misunderstanding. VV-2, which is the sample that Doctor Melton tested and found a mixture in, it's Petitioner's blood sample. It is not a hair sample. I wasn't sure if the Court was clear on that." 4/22/05 RT 153. The court immediately interrupted, "And it's consumed." *Id.* Cooper's counsel agreed that Dr. Melton had consumed the sample on the card she had been sent, but stated, "[T]hat doesn't necessarily mean that there isn't more VV-2 in San Bernardino or at the DOJ that could be tested." *Id.* The State's counsel then responded, "I can represent to the Court that VV-2 was completely consumed by Doctor Melton. Doctor Melton was shipped the remainder of this particular blood sample, and she consumed it, and it's reflected in her report. So we don't have any more of that particular reference sample." *Id.* at 156.

The State's counsel seems to have meant to say (or at least to have meant the court to understand) that there was no blood remaining in vial VV-2. If that is what counsel meant to say, it was a startling statement. The State had never before said or even suggested such a thing. For example, when Cooper moved in September 2004 for an evidentiary hearing on how the DNA of two people came to be in vial VV-2, the State did not say or even suggest that vial VV-2 was empty. Nor had the State ever presented evidence to support such a statement. Nor had the district court relied on the fact that vial VV-2 was empty in denying Cooper's motion for an evidentiary hearing.

Cooper's counsel told the district court that Dr. Melton's finding that the DNA of two or more people was in the blood that came from vial VV-2 was "extremely alarming and mandate[d] further inquiry." The district court refused to allow any investigation into the issue, even though the presence of additional DNA in vial VV-2 clearly pointed to evidence tampering by the State.

iv.   Refusal to Allow Access to the State-Designated Lab's
      Raw Data and Notes Concerning Asserted Contamination

Dr. Maddox of the Orchid Cellmark laboratory sent a total
of ten samples to each of the two designated testing labs. Dr.
Siuzdak was the tester designated by the State. Dr. Ballard
was the tester designated by Cooper.

Sample 1 was a piece of the t-shirt that had been chosen by
Dr. Maddox and Mr. Myers as likely to contain Cooper's
blood. Samples 2-6 were taken from other parts of the t-shirt
and were intended to serve as controls. Samples 7-10 were not
taken from the t-shirt; they were also intended to serve as con-
trols.

As I will explain below, the EDTA results obtained by Dr.
Siuzdak and Dr. Ballard are remarkably consistent for all of
the samples except Sample 1 and Sample 8. Dr. Siuzdak
found that his piece of Sample 1 (the sample supposedly con-
taining Cooper's blood) contained an extremely high level of
EDTA, more than twice as high as any other sample. If Dr.
Siuzdak's piece of Sample 1 contained Cooper's blood, and
if his EDTA result is valid, this indicates that Cooper's blood
was planted on the t-shirt. By contrast, Dr. Ballard found that
his piece of Sample 1 contained a somewhat elevated, but
fairly low, level of EDTA.

Dr. Siuzdak submitted his report, containing the high
EDTA reading for Sample 1, to the district court on October
5, 2004. On October 27, without prior warning, Dr. Siuzdak
withdrew his report. His fax to the court stated in its entirety:

> On Monday, October 5th I submitted a report on
> the Cooper samples tested for the presence of
> EDTA. I now believe that the samples tested were
> contaminated with EDTA in my laboratory and
> therefore must retract the report submitted. I deeply

apologize for the inconvenience and confusion this report may have caused.

ER 4464.

Cooper moved to be allowed access to Dr. Siuzdak's raw data and bench notes relevant to his testing of all the samples. ER 4465-82. The district court denied this access. ER 4751. Cooper has never been permitted to see Dr. Siuzdak's raw data and bench notes, and has never been permitted to investigate the nature and possible significance of the purported contamination. Dr. Siuzdak has never been asked to provide an explanation for his conclusion that there was contamination in his lab.

### v. District Court Reliance on Faulty Controls

As discussed in greater detail below, five supposed "control" samples were taken from the tan t-shirt. When the two laboratories tested these samples, everyone assumed that they contained no human material (and therefore no human DNA) and that they contained only a background level of EDTA. However, at least three of the five purported control samples taken from the t-shirt (Samples 2, 3, and 4) actually contained human DNA. ER 4659, 4669. The amount of DNA in these samples corresponds closely with an elevated level of EDTA in these same samples. The combined presence of DNA and elevated levels of EDTA strongly suggest that these samples contained preserved blood that had been planted on the t-shirt. Therefore, these "control" samples from the t-shirt were not, in fact, controls at all. Nonetheless, the district court assumed that these samples were valid controls.

Because the district court assumed that Samples 2, 3 and 4 were valid controls, it concluded that the results of the DNA tests were invalid. *See* Dist. Ct., 510 F.3d at 939 ("The EDTA level in the subject stain is not elevated, but is instead *lower than that of most of the control areas*. As a result, the test

refutes Petitioner's tampering theory." (emphasis added)); *id.* at 941 ("From the test data, the Court concludes that the level of EDTA in the subject stain is 110 nanograms. *Comparing* the EDTA level of the subject stain *to that for the control specimens*, the Court concludes that there is no reliable evidence of tampering." (emphasis added)). But because the district court erred in assuming that these samples were valid controls, it erred in concluding that the results of the DNA tests were invalid.

The only sample that could provide a baseline level of EDTA in the t-shirt, and could thus serve as a valid control, is Sample 6. It is the only sample from the t-shirt that contained no human DNA. Both Dr. Ballard and Dr. Siuzdak found only background levels of EDTA in Sample 6. The levels of EDTA found in Sample 6 by both Dr. Ballard and Dr. Siuzdak were far lower than the levels of EDTA found in any other sample taken from the t-shirt. (Recall that the district court found that "the levels of EDTA in the T-shirt were accurately measured" by Dr. Ballard. Dist. Ct., 510 F.3d at 941.) The virtual absence of EDTA in Sample 6 when compared with the elevated EDTA levels in Sample 1, particularly the portion of Sample 1 tested by Dr. Siuzdak, strongly suggests that Cooper's blood was planted on the shirt.

### vi.   Refusal to Allow Further Testing

The district court refused to allow further EDTA testing after Dr. Ballard and Dr. Siuzdak made their reports, and after Dr. Siuzdak withdrew his report on the ground of asserted contamination. If the piece of Sample 1 tested by Dr. Siuzdak contained Cooper's blood, as Dr. Maddox and Mr. Myers thought it did, and if Dr. Siuzdak's finding of an extremely high level of EDTA in his piece of Sample 1 is valid, there is no question that Cooper's blood was planted on the t-shirt.

The district court refused to allow further testing despite the fact that Dr. Siuzdak and Dr. Ballard still have sufficient

amounts of the samples provided to them to perform further testing. In light of the high level of EDTA detected by Dr. Siuzdak on his piece of Sample 1, and in light of the unexplored nature of Dr. Siuzdak's belief that there was contamination in his laboratory, it was unreasonable not to pursue further testing.

c. What the EDTA Test Results Tell Us When Combined with DNA Tests on the Same Samples

After Dr. Ballard and Dr. Siuzdak submitted their reports to the district court, the Orchid Cellmark laboratory sent other pieces of the samples to the State of California's DNA laboratory to determine how much DNA was on those samples. ER 4659, 4669. When Dr. Ballard and Dr. Siuzdak submitted their reports, they did not know the results of this DNA testing.

The results of the EDTA testing (performed by Drs. Ballard and Siuzdak) and the DNA testing (performed by the State lab) can be put into a single table. In reading this table, recall that Sample 1 is the sample thought to contain Cooper's blood.

Table 1: EDTA and DNA Data (nanograms)[4]

| Sample | Siuzdak EDTA[5] | Ballard EDTA | DNA |
|:---:|:---:|:---:|:---:|
| 1 | 3341 | 110 | .55 |
| 2 | 856 | 220 | .33 |
| 3 | 1545 | 360 | .77 |
| 4 | 773 | 160 | .21 |
| 5 | 438 | 110 | inconclusive |
| 6 | 271 | 16 | 0 |
| 7 | 480 | 7 | N/A |
| 8 | 1608 | 1100 | N/A |
| 9 | 376 | 6 | N/A |
| 10 | 313 | 0 | 0 |

We can draw two conclusions from the table.

First, we can conclude that Dr. Siuzdak's EDTA results are very likely valid based on a comparison of his results with those of Dr. Ballard. A comparison of the results for Samples 2-7 and 9-10 (that is, excluding Samples 1 and 8) shows that the results obtained by Dr. Siuzdak and Dr. Ballard are consistent. Dr. Siuzdak's results are expressed in higher absolute numbers than Dr. Ballard's, but the relative numbers of the two are remarkably consistent. This may be seen in the following graph:

---

[4] The data are from Lee Report (Siuzdak EDTA); ER 5414 (Ballard EDTA); ER 4659, 4669 (DNA). The district court did not order DNA testing of control Samples 7 through 9.

[5] Dr. Siuzdak reported his values as concentration of EDTA. Dr. Lee's analysis of the EDTA results converted Dr. Siuzdak's "values to the equivalent amount of EDTA in the original cloth cuttings." Lee Report at 2.

Graph 1: Comparison of Ballard and Siuzdak EDTA Measurements[6] (Excluding Samples 1 and 8)



The consistency in results for Dr. Siuzdak and Dr. Ballard strongly suggests that Dr. Siuzdak's results are valid. That is, if Dr. Siuzdak had EDTA contamination in his lab or if his instruments were miscalibrated, the contamination or miscalibration affected all of his measurements equally. If this is true, Dr. Siuzdak's results — as measurements of relative rather than absolute amounts of EDTA — are valid.

---

[6]The best fit linear regression equation for these data is: Siuzdak = 288.078 + 3.031 * Ballard. The $R^2$ value for these data is 0.892; the regression coefficient for the independent variable is statistically significant at $p < 0.001$.

For purposes of this comparison (and of the above graph), I excluded Samples 1 and 8. Sample 8 is a control not taken from the t-shirt. It is a piece of cloth onto which Dr. Maddox at Orchid Cellmark had placed a known amount of EDTA-preserved blood, with a known concentration of EDTA. Both Dr. Siuzdak and Dr. Ballard found greatly elevated levels of EDTA in Sample 8, though Dr. Siuzdak found a relatively higher EDTA level. That difference may be partially explained by Dr. Siuzdak's relatively higher amounts of EDTA for all of his samples. The remaining disparity may not be significant. Dr. Terry Lee, an expert hired by the State to evaluate the results of Dr. Siuzdak and Dr. Ballard, concluded that the disparity in results for Sample 8, considered by itself, was not significant. Respondent's Analysis of EDTA Test Results, Oct. 28, 2004, Docket No. 264, Ex. A at 2.

That leaves Sample 1. Sample 1 is the new sample thought to contain Cooper's blood. It was chosen by Dr. Maddox and Mr. Myers to replace the old sample from Area 6G. Though Sample 1 supposedly contained Cooper's blood, we cannot be sure that it did, as I explained above. Dr. Siuzdak measured an extremely high level of EDTA for Sample 1. Dr. Ballard measured only a somewhat elevated level of EDTA for Sample 1. A possible, perhaps likely, reason for the disparity in their results is that Dr. Siuzdak's piece of Sample 1 contained a great deal of Cooper's blood, while Dr. Ballard's piece contained significantly less, perhaps none. Sample 1 was an unusually large sample by comparison to the other samples. It was also irregularly shaped, unlike the other samples which were simple squares. ER 5202-03. Finally, Dr. Maddox and Mr. Myers assumed that all of Sample 1 contained Cooper's blood. But, as noted above, they did not perform any tests on Sample 1, or its individual pieces, to confirm this assumption.

Second, we can conclude that Dr. Siuzdak's EDTA results are very likely valid, based on analysis of Samples 2, 3 and 4. Samples 2, 3 and 4 were supposed to be control samples that contained no blood. Instead, they almost certainly contain

significant amounts of blood. Further, it is likely that this blood was planted on the t-shirt. This may be seen if we look at both the DNA and the EDTA results for Samples 2, 3, 4 and 6. All four of these samples were taken from the t-shirt, and were supposed to have been control samples. (Sample 5 has inconclusive DNA results, so I put it to one side. Samples 7, 8, 9 and 10 are control samples that were not from the t-shirt, so I put them to one side also.)

For Samples 2, 3, 4 and 6, we have a known amount of DNA and a known amount of EDTA. Samples 2, 3 and 4 all have significant amounts of DNA. Only Sample 6 has no DNA. For all four of these samples, there is a remarkably strong correlation between the amount of DNA in the sample and the amount of EDTA in the sample. The greater the amount of DNA in a sample, the greater the amount of EDTA in that sample. This holds true for the results of both Dr. Siuzdak and Dr. Ballard. This may be seen in two graphs, one for Dr. Siuzdak's results and one for Dr. Ballard's results:

### Graph 2: Correlation Between DNA and Siuzdak's EDTA Measures[7] (Samples 2, 3, 4, and 6)



[7]The best fit linear regression equation for these data is: DNA = -0.185 + 0.001 * Siuzdak. The $R^2$ value for these data is 0.974; the regression coefficient for the independent variable is statistically significant at $p = 0.013$.

Graph 3: Correlation Between DNA and Ballard's EDTA Measures[8] (Samples 2, 3, 4, and 6)



These graphs, showing the presence and amount of DNA in Samples 2, 3, 4, and 6, tell us a number of things. First, they tell us that Samples 2, 3 and 4 are not valid controls. Thus, the district court erred in treating them as controls when it interpreted (and disregarded) Dr. Ballard's results. *See, e.g.*, Dist. Ct., 510 F.3d at 939. The EDTA levels in Sample 6, the

---

[8]The best fit linear regression equation for these data is: DNA = -0.093 + 0.002 * Ballard. The $R^2$ value for these data is 0.955; the regression coefficient for the independent variable is statistically significant at $p = 0.023$.

only true control, are significantly lower than the EDTA levels in Samples 2, 3 and 4, and in Sample 1, the sample thought to contain Cooper's blood.

Second, the variation in EDTA levels in three supposed control samples — Samples 2, 3 and 4 — directly corresponds with the variation in human DNA levels in those samples. EDTA is present in many substances, such as laundry detergent, salad dressing, and household cleaners. *See* Dist. Ct., 510 F.3d at 947 & n.34. Those substances, however, do not contain human DNA. Human blood stored in purple-topped EDTA tubes, such as those used by the SBCSD, has *both* EDTA and human DNA. Samples 2, 3 and 4 had elevated levels of EDTA and correspondingly elevated levels of human DNA. The most plausible explanation is that the EDTA was deposited on the t-shirt along with human DNA. The most logical source of such a deposit is human blood stored in a purple-topped EDTA tube.

We know that Cooper's EDTA-preserved blood sample (VV-2) and other EDTA-preserved blood samples from the victims were kept in an evidence refrigerator to which up to twenty people had ready access. 6/23/03 RT 106, 134. We also know that blood could be withdrawn from those tubes without breaking any seals. 6/25/03 RT 330. Finally, we know that "anyone with access to that refrigerator . . . could take items in and out of it without there being any record of it at all, without any written record." 6/23/03 RT 134. This information, coupled with the EDTA and DNA findings described above, strongly suggest that someone in the SBCSD took blood from one or more purple-topped EDTA tubes and placed that blood on the t-shirt.

Third, the district court did not account for the correlation between human DNA and EDTA in the control samples when it stated: "While the extraction and measurement of EDTA in a sample may theoretically be accomplished, the ubiquity of EDTA in the environment prevents any meaningful interpre-

tation of the significance of an 'elevated' level of EDTA within a forensic sample." Dist. Ct., 510 F.3d at 941. The data demonstrate that, contrary to the view of the district court, meaningful interpretation of the significance of an elevated level of EDTA *is* possible. They demonstrate, in fact, that Dr. Siuzdak's test results were probably valid.

#### d. What Dr. Siuzdak Did Not Know

Neither Dr. Siuzdak nor Dr. Ballard, nor indeed any expert, was given the opportunity by the district court to look at both the EDTA and the DNA data.

When Dr. Siuzdak withdrew his results, he was unaware of Dr. Ballard's results. He was also unaware of the results of the DNA testing by the State. We are now able to see what Dr. Siuzdak could not see when he withdrew his test results.

First, Dr. Siuzdak was unaware of the remarkable congruence of his supposedly contaminated results with those of Dr. Ballard. Second, Dr. Siuzdak was unaware that Samples 2, 3 and 4 each contained significant amounts of DNA, which closely correlated with the amount of EDTA in those samples. Dr. Siuzdak mistakenly thought those samples contained no blood, and therefore should have contained no EDTA. He thus thought that Samples 2, 3 and 4 were valid controls, and that he should have found little or no EDTA in them. Had Dr. Siuzdak known that Dr. Ballard had obtained remarkably congruent results, and that Samples 2, 3 and 4 contained human DNA and were not valid controls, it is entirely possible, perhaps likely, that he would not have withdrawn his results based on supposed contamination in his lab. It should have been an easy matter to ask Dr. Siuzdak whether, in light of what the district court later learned, he would still withdraw his test results. The district court, however, did not do so.

#### e. Summary

It is clear from the foregoing that the district court did not properly carry out our directive to perform EDTA testing on

Cooper's blood on the t-shirt. The court did not permit Cooper's experts to participate in or even see the selection of the t-shirt samples chosen for testing. It refused to allow testing of the newly chosen sample, which was supposed to contain only Cooper's blood, to determine if, in fact, it contained his blood, or any blood at all. It refused to permit an inquiry into why vial VV-2, which was supposed to contain Cooper's blood, contained the DNA of two or more people. It refused to permit discovery of Dr. Siuzdak's raw data and bench notes after he withdrew his test results — results that strongly suggested that Cooper's blood had been planted. It incorrectly concluded that Samples 2, 3 and 4 were proper controls, and therefore incorrectly concluded that the testing laboratories' results could not be correct. And it refused to allow further testing after it allowed Dr. Siuzdak to withdraw test results that had been favorable to Cooper.

The test results that we do have strongly suggest that Dr. Siuzdak may not have had contamination in his laboratory that invalidated his results, and strongly suggest that Dr. Siuzdak's sample, supposedly containing Cooper's blood, did in fact contain an extremely high level of EDTA. In other words, the test results we already have strongly suggest that Cooper's blood was planted on the t-shirt.

### 2.   False Evidence Presented at Trial

If the EDTA testing already performed shows that Cooper's blood was planted on the t-shirt, or if further EDTA testing does the same thing, that showing greatly increases the likelihood that much of the evidence introduced at trial was false. If the State introduced false evidence at trial, it violated Cooper's constitutional right to due process under *Mooney* and *Napue*. If Cooper's constitutional right to due process was violated, he has satisfied the threshold test for showing actual innocence under *Schlup*. In assessing whether a federal habeas petitioner has made a showing of actual innocence under *Schlup*, a district court is not limited to evidence intro-

duced at trial. Rather, it may consider all relevant evidence. *See Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997) (en banc).

### a. The False Evidence

If Cooper's blood was planted, that would greatly increase the likelihood that the following evidence at trial was false.

### i. Josh Ryen's Testimony

Josh Ryen was eight years old at the time of the murders. He was left for dead in his parents' bedroom with his throat cut. He did not take the stand, but his audio- and videotaped testimony was introduced at trial. That testimony was that he saw either a single man or a single shadow in the house during the murders. This testimony was flatly inconsistent with the information he provided immediately after the murders.

### (a). Josh Ryen's Testimony at Trial

Josh Ryen did not testify in person at trial. Instead, two recorded interviews with Josh were played for the jury. One was an audiotaped interview conducted in the office of a psychiatrist, Dr. Lorna Forbes, on December 1, 1983, six months after the murders. The other was a videotaped interview conducted on December 9, 1984, in the midst of Cooper's trial.

A transcript of the audiotaped interview with Dr. Forbes includes the following statements:

> Q [Dr. Forbes]:  Who went to bed first? You guys or everybody all together or what?

> A [Josh]:  I think my Mom, I, my sister and Chris went to bed, but my Dad stayed up.

> Q:  You don't remember, for sure?

A:   That's what I think. Then I heard my Mom scream, and I walked in there with Chris, and I saw someone.

Q:   Well, did, did you mean? Where did you see him?

A:   Like over by the bed, my Mom's bed.

* * *

Q:   Okay, was the person standing up or what?

* * *

A:   And then I went back, and . . .

Q:   Well, why did you go back; what was happening with the person standing by the bed; was he standing facing you, or what did you see?

A:   He was turning his back against me.

* * *

Q:   Do you remember seeing him doing anything to your mother when she was screaming?

A:   No, I just saw his back and his hair.

Q:   And his hair? Was he bending over or standing up straight or what?

A:   Uh, he was like . . . His head was down, he was down.

Final Stipulation Regarding Correction of Transcripts on Appeal, July 31, 1986, Interview of Josh Ryen by Lorna For-

bes, Ex. D at 14-16 (ellipses in original; asterisks indicate omitted material). Later in the interview, Dr. Forbes asked Josh, "you went in there and saw this thing; did you think it was a man or a woman?" Josh replied, "I didn't . . . probably a man because women usually don't do that sort of thing." *Id.* at 19.

We know that in this audiotaped interview Josh had described seeing a "puff of hair" on the killer. We also know that the State excised the "puff of hair" reference from the interview, and that this part of the interview was not played to the jury. 12/13/84 RT 4991-92. (I discuss below the significance of the "puff of hair" reference, and the significance of the prosecution not playing it for the jury.)

During the videotaped second interview, conducted in December 1984, counsel for both sides questioned Josh. Josh's grandmother, Dr. Mary Howell, was also present during the interview. The videotaped interview was played for the jury on December 13, 1984, immediately before the jury heard the audiotaped interview with Dr. Forbes. The prosecutor asked, "Did you ever see anybody in the house that didn't belong there?" The examination proceeded:

> Q [prosecutor]: And when you say it could have been someone like your mom, who are you talking about, or what did you see that —
>
> A [Josh]: I don't really — saw like a shadow or something.
>
> Q: Where did you see the shadow?
>
> A: Like the bathroom was here. I saw it right like the bathroom.
>
> Q: By the bathroom?

A:   Yeah.

Q:   When did you see the shadow?

A:   When I saw my sister.

Q:   And how many shadows did you see?

A:   *Just one*.

12/13/84 RT 4968-69 (emphasis added).

In closing argument, the last evidence the prosecutor discussed in rebuttal was Josh's recorded interviews. He emphasized the consistency of Josh's story in the two interviews, and argued that consistency showed that Cooper was the perpetrator:

> We have from Josh the same basic story to different people at different times that have been both tape recorded and videotaped.

> . . . During the entire time that Josh was with his grandmother, a time of protection and love, Josh told the same basic story, a story that you ladies and gentlemen got a chance to hear, the story that shows that there was just . . . one attacker: Kevin Cooper with a hatchet in one hand and a knife in the other.

2/7/85 RT 7823-24. On the second day of deliberations, the jury requested to rehear the entire audiotaped interview with Dr. Forbes. 2/8/85 RT 7863-A. This was the first of only two read-backs requested by the jury.

The story told in the two recorded interviews is incompatible with Josh's statements made immediately after the murders.

#### (b). Josh Ryen's Statements Immediately After the Murders

When Josh first arrived at the emergency room on the afternoon of June 5, he was unable to speak because his throat had been cut. Josh's handwriting was illegible. A clinical social worker named Don Gamundoy devised an effective way for Josh to communicate basic information. Gamundoy wrote out the letters of the alphabet, numerals 0 through 9, and the words "yes" and "no" on a piece of paper on a clipboard. Josh was able to point to the letters, numbers, and the two words in responding to Gamundoy's questions.

Josh accurately indicated his full name, his date of birth, and his telephone number. Then Gamundoy asked Josh how many people attacked him. Josh pointed to "3" and "4" on the sheet. Gamundoy asked whether the attackers were male. Josh pointed to "yes." Gamundoy asked whether they were black. Josh pointed to "no." Gamundoy asked whether the attackers looked like Gamundoy, who is Hawaiian but is frequently mistaken for Hispanic. Josh pointed to "no." Gamundoy asked if the attackers were white. Josh pointed to "yes." ER 1272-79. Medical personnel treating Josh in the emergency room described Josh as conscious, alert, and immediately responsive during the time Gamundoy was questioning him. 1/10/85 RT 6229-30; 1/17/85 RT 6626, 6630, 6636.

SBCSD Sergeant Arthur, who was in charge of the investigation, dispatched Deputy Sharp to the emergency room. 1/8/85 RT 5980-82. Deputy Sharp was the first member of law enforcement to question Josh. Deputy Sharp entered the emergency room as Gamundoy was ending his own questioning, at about 2:23 p.m. 1/8/85 RT 5933, 5966-67. Deputy Sharp testified at trial that he questioned Josh in the emergency room from about 2:30 to 2:45, and then resumed questioning again in the CAT scan room at about 3:45. Gamundoy did not accompany Deputy Sharp and Josh into the CAT scan room. 1/8/85 RT 6007-08, 6018-19. Periodically during the inter-

view, Deputy Sharp communicated with Sergeant Arthur who was at the scene of the crime.

Deputy Sharp's report and trial testimony suggest that even at this early stage of the investigation, the SBCSD did not want to be tied down to Josh's recollection of events. Deputy Sharp testified at trial that he dictated his report at 6 p.m. on June 5, but that he never verified that the typed version corresponded to his two or three pages of handwritten notes. He subsequently destroyed those notes. Deputy Sharp testified that he reviewed the typed report two days later, after having been out in the field and working on the case, and after interviewing people about the Lease house. Over the lunch recess during his trial testimony, Deputy Sharp altered the date on the report from June 6 to June 7, to make the date on his report correspond to the date he gave in his trial testimony. ER 1403; 1/8/85 RT 5991, 5994, 5998-6001.

**Volume 2 of 2**

Deputy Sharp testified at trial that he used a hand-squeeze method of communication with Josh. The hand-squeeze method, as described by Deputy Sharp, failed to provide Josh with an effective means of distinguishing between "no" and "I don't know." Deputy Sharp testified that a squeeze meant "yes." The absence of a squeeze meant "no." ER 1291-93. Deputy Sharp's report states that Josh "wr[o]te his name and point[ed] to numbers for his home phone number, date of

birth, etc. Then, all other information was done by the suspect [sic] squeezing my hand in order to answer yes to any questions that I might ask." ER 1403-04. At trial, Deputy Sharp could not explain how he had used the hand-squeeze method to elicit the first piece of information in his report that he attributed to Josh: "The victim first advised me that there were three white male adult subjects in the residence and he had been asleep." ER 1403, 1293-99. In all likelihood, Gamundoy was the source of this information. But according to Deputy Sharp's report, he obtained all of this information himself.

At trial, the prosecutor dismissed the information Josh provided to Gamundoy — that the murderers were three or four white men — as a mistake. The prosecutor contended that Josh had been confused, and that he had described the killers as three Mexican men who had come to the Ryen house during the day of June 4. Deputy Sharp's report indicates that he received information about the Mexicans in the CAT scan room, where, according to Deputy Sharp, Josh "seemed to be more alert." *See also* ER 1299. This part of the interview took place after a one hour break, during which Deputy Sharp had communicated with Sergeant Arthur at the crime scene.

Deputy Sharp initiated discussion of the three Mexicans by asking "if there was anyone around [Josh's] house yesterday that didn't belong there," to which Josh responded "yes." Then, through yes-or-no questioning and hand squeezes, Deputy Sharp purportedly learned that "at approx. dusk there was an older model Chevy Impala, blue in color, four-door, no primer, that had pulled into the driveway of his residence." The vehicle was "definitely a low rider." Through the hand-squeeze method, Josh purportedly provided a detailed description of the three men in the car, including precise height, build, hair color and length, style and color of clothing, age ranges, and nationalities.

After this detailed description, Josh gave the first response that we know is false. Deputy Sharp wrote, "I asked the vic-

tim if his family owned a white station wagon. The reply was in the negative." ER 1404. (In fact, we know that the family owned a white station wagon.) The question that allegedly followed formed the basis for the prosecutor's claim at trial that Josh was merely "confused" and had no actual recollection of his assailants: "I then asked him if he felt these [the Mexicans] were the people that were in his house this morning when everything went crazy, to which he advised in the affirmative." When Deputy Sharp "again asked the victim if he was sure it was three Mexicans rather than three white male adults[,] [t]he victim advised of the three Mexicans. The victim then moved his shoulders and appeared to be confused." At that point, the interview terminated as doctors took Josh into surgery. Deputy Sharp conceded at trial that he did nothing in asking his questions to try to distinguish for Josh between the three Mexican males and the three or four white males he had initially identified as his assailants. 1/8/85 RT 6038-40.

Over the course of the interview, Deputy Sharp spoke with Sergeant Arthur (who was at the crime scene) three times on the telephone. Despite what Deputy Sharp later wrote in his report, officers at the crime scene on that day — including Detective Hector O'Campo — learned that Josh had described his assailants as three white men. ER 1315. The communications are confirmed by the police log of the attack, which was entered sometime between 2:06 p.m. and 2:29 p.m., describing as suspects "three young males" driving the Ryens' station wagon. ER 3688; 8/13/04 RT 73. Given the times in the police log, Deputy Sharp must have communicated this information to Arthur either before he started questioning Josh or within a few minutes of initiating contact. 1/4/85 RT 5973-75.

On June 6, Sergeant Arthur assigned SBCSD Detective O'Campo to make contact with Josh. At trial, Detective O'Campo denied talking to Josh about suspects or what happened during the attack at any point prior to a formal interview with Josh on June 14, 1983. ER 1322. Yet hospital

personnel confirmed that Detective O'Campo did speak with Josh about a Mexican in a red shirt prior to that date. ER 1302, 1307-09. Further, both Josh's grandmother and a nurse on duty on June 6 testified that Detective O'Campo asked Josh substantive questions on that date, and that Detective O'Campo took notes about what he was learning. ER 1306-09; 1/14/85 RT 6303-11, 6326-27; 2/7/85 RT 7795-96. At trial, Detective O'Campo initially lied, denying that he took any notes on June 6. He then admitted that he destroyed his June 6 notes on June 8, after typing up a report. The documentation that Detective O'Campo had submitted to the SBCSD as of October 1983 gives no indication he had even spoken with Josh on any date other than June 14. Yet Detective O'Campo eventually admitted at trial that he had spoken with Josh approximately twenty times during Josh's stay at the hospital, meeting with him almost every day during that period. ER 1316-17; 1/9/85 RT 6076-84.

Detective O'Campo admitted at trial that sometime between June 6 and June 9, he became convinced in his own mind that Cooper was responsible for the murders. He admitted that he had a very strong desire for Cooper to be convicted, and that he had more than a mere belief that Cooper was responsible — he *knew* that Cooper was responsible. 1/9/85 RT 6095-96. SBCSD Captain Schuyler, commander of the public affairs division, made clear at trial that by June 6 or 7, after Cooper had become a suspect, the SBCSD's publicly stated position was that Josh could not provide any useful information. 1/15/85 RT 6423-24. Captain Schuyler testified on cross examination that he had "probably" been the source of an Associated Press story reporting that Josh had told investigators that three Mexicans in a blue car had come to the Ryen house during the day before the killings. *Id.* at 6422-23. No public mention was made of the fact that Josh had told Gamundoy, before any SBCSD detectives had arrived at the hospital, that the killers had been three or four white men.

On June 14, 1983, Detective O'Campo interviewed Josh about what he remembered about the attacks. Josh was now able to speak. Breaking with his standard policy of tape-recording formal interviews, Detective O'Campo only took notes on what Josh said. He testified at trial that he destroyed his notes after writing his report the following day. 1/9/85 RT 6097-98. At trial, Detective O'Campo conceded that he could think of no reason not to tape record the interview other than to "shape the context that the interview is presented [and] shape the information that is presented in the report." 1/9/85 RT 6103.

Dr. Jerry Hoyle, a psychologist at the hospital, observed the entire June 14 interview between Josh and Detective O'Campo. During the interview, Dr. Hoyle took notes to assist with Josh's treatment. Dr. Hoyle's testimony at trial showed that Detective O'Campo's report of the interview had distorted what Josh had said. For example, Josh had used the words "they" and "them" to refer to his assailants, while Detective O'Campo's report referred to only one attacker. ER 1434, 1330-32, 1422-28.

SBCSD Reserve Deputy Simo guarded Josh for part of the time he was in the hospital. Deputy Simo testified that on the evening of June 15 he was playing Uno with Josh when the television news came on. The program displayed a photograph of Kevin Cooper, with his hair combed out in a natural "Afro" hairstyle. Josh stated without prompting that Cooper was not the person "who did it." Within fifteen minutes, Deputy Simo called Detective O'Campo to report what Josh had said. ER 1338.

As a volunteer deputy, Deputy Simo was not responsible for preparing reports. Rather, Detective O'Campo had that duty. 1/10/85 RT 6183-84. Detective O'Campo returned Deputy Simo's call that evening. Deputy Simo testified that Deputy O'Campo told him that "he knew about that information, that he had talked to — there was three Mexicans that had

come previously, apparently looking for a job, and it could have been, either because of the trauma it was some flashback on that," and that Deputy O'Campo suggested to Deputy Simo that the reason Josh made the statement that it wasn't Kevin Cooper was because of Josh's trauma. 1/15/85 RT 6404-05. No one from SBCSD took an official report from Deputy Simo. In May 1984, Deputy Simo saw newspaper articles about Josh and contacted Detective O'Campo again. Only then did Detective O'Campo ask Deputy Simo to come down to the station so that Detective O'Campo could make a report. 1/15/85 RT 6405-06.

Soon after Josh made this statement to Deputy Simo, he made a similar statement to his grandmother, Dr. Mary Howell. Cooper's picture appeared on television. Dr. Howell asked Josh whether he had ever seen Cooper before. Josh responded no. ER 1344-45.

Dr. Lorna Forbes is a psychiatrist specializing in treating children who have survived the murder of a family member. She began treating Josh in October 1983. On December 1, 1983, six months after the attacks, Dr. Forbes audiotaped an interview with Josh using questions submitted by Cooper's defense counsel. This was one of the two interviews played for the jury during Cooper's trial.

Dr. Forbes questioned whether Cooper committed the murders. In a sworn declaration dated October 30, 1999, she stated that she had "kept in touch with Josh and Dr. Howell from our first contact and to this day." *Cooper v. Calderon*, No. 99-71430, Exhibits to Petition for Writ of Habeas Corpus, Ex. 74 (S.D. Cal. 1999). While professionally and ethically bound to maintain any confidences Josh shared with her during the course of treatment, Dr. Forbes urged the court in 1999 to pursue all opportunities to exculpate Cooper. She stated, "I have maintained the opinion that it would have been extremely difficult for one person to have committed the four murders and the assault on Josh. . . . It is in my mind that it

is imperative that a DNA test is performed to assure as much as possible that an innocent man is not executed." *Id.*

In his tape-recorded interview with Dr. Forbes, Josh said that he saw a person with a "puff of hair" standing over his mother during the attack. He made a similar statement to his grandmother in May of 1984. 1/10/85 RT 6173 (in camera statement of Mr. Negus). It is almost certain that Cooper did not have a "puff of hair" at the time of the murders. It is undisputed that Cooper's hair was braided when he escaped from prison on June 2. His hair was also braided on June 5, the day after the murders. A hotel clerk in Tijuana, where Cooper arrived at 4:30 p.m. on June 5, testified that Cooper had braids when he arrived. Another hotel clerk, who did not testify, provided a sworn statement that Cooper had his hair in braids. However, pictures of Cooper that appeared on television after the murders show him wearing a large Afro — that is, they show him with a "puff of hair."

The prosecutor excised the "puff of hair" statement from the audiotape that was played to the jury. The excision of the reference to the "puff of hair" meant that Cooper's attorney did not argue to the jury that Josh could not have seen Cooper with a "puff of hair" during the killings, and that Josh was confusing what he saw on the night of the killings with what he saw later on television. It also meant that the prosecutor could plausibly represent to the jury that "Josh told the same basic story."

(c).  Josh Ryen's Testimony at the District Court Hearing

At the invitation of the district court, Josh Ryen delivered an in-person unsworn statement at the end of the final day of the 2004-2005 hearing on Cooper's second habeas application. Josh testified on April 22, 2005:

> The first time I met Kevin Cooper, I was eight years old and he slit my throat. He hit me with a

hatchet and put a hole in my skull. He stabbed me
twice, which broke my ribs and collapsed one lung.

. . . .

Every time Kevin Cooper opens his mouth, every-
one wants to know what I think, what I have to say,
how I'm feeling, and the whole nightmare floods all
over me again. The barbecue, me begging to let
Chris spend the night, me in my bed, Chris on the
floor beside me. My mother screams, Chris gone,
dark house, hallway, *bushy hair*, everything black,
mom cut to pieces, saturated in blood, the nauseating
smell of blood.

. . . . Helicopters give me flashbacks of the life
flight and my Incredible Hulks being cut off by
paramedics. *Bushy hair* reminds me of the killer.
Silence reminds me of the quiet before the screams.
Cooper is everywhere. There is no escaping him.

4/22/05 RT 129-133 (emphases added).

The district court denied Cooper's counsel's repeated
requests to allow discovery concerning Josh's memory and
his testimony at trial. The court also denied Cooper's coun-
sel's request to cross examine Josh at the habeas hearing.
Immediately after Josh's statement at the hearing, the district
court required Cooper's attorneys to make their closing argu-
ments.

The district court denied Cooper's habeas application from
the bench the same day Josh testified. The court stated:

I do recognize that the victims who came today are
technically under the federal law — it's not man-
dated or it's analogous they're not required to speak.
But I did think *for completion of the record*, it is

helpful for any reviewing court to at least hear their statements about their views of the matter. And so the Court recognizes your objections, but believes that because it's a case of major importance, that it's appropriate to give the victims a say. And it was not a significant period of time, but it does *complete the record* for the reviewing court.

4/22/05 RT 182 (emphases added). Given the district court's refusal to permit discovery and cross examination, Josh's unsworn testimony at the end of the habeas hearing hardly "completed the record."

Instead, Josh's testimony at the 2004-2005 hearing raised new questions. In its order denying Cooper's habeas petition, the district court wrote that the videotape and audiotape interviews benefitted Cooper because "[t]he defense also avoided the drama and sympathy that would have undoubtedly occurred had the defense called victim Josh Ryen to the stand in the trial *and heard his firsthand recollection about a man with bushy hair*." Dist. Ct., 510 F.3d at 1000 (citing 4/22/05 RT 133) (emphasis added). Josh's testimony in 2005 was the first time Josh made an in-court statement that he had seen someone with "bushy hair" during the attack. If Cooper's attorneys had been permitted to question Josh in the 2005 hearing, they could have asked him about his recollection of the attacker's "bushy hair" (or "puff of hair"), and could have pointed out that it was extremely unlikely that the man with "bushy hair" on the night of June 4 — if, indeed, there was such a man — was Cooper.

ii. Drop of Blood A-41

A drop of blood was found by Deputy Baird on the wall in the hall across from the master bedroom in the Ryen house. Chips of paint with the blood on them were taken from the wall and labeled "A-41." The State introduced evidence at trial through SBCSD Criminologist Daniel Gregonis that his

testing of A-41 showed that its blood characteristics matched those of Cooper. During deliberations the jury requested that Gregonis's testimony about A-41 be read back. 2/11/85 RT 7864-65. This was the second of only two read-backs requested by the jury. (The other was Josh's audiotaped interview with Dr. Forbes.)

There is a strong likelihood that the results of the blood tests performed on A-41, presented at trial, were false evidence. There is also a strong likelihood that state actors tampered with A-41 to ensure that it would generate inculpatory results when Cooper's post-conviction DNA testing was conducted in 2002.

Gregonis delayed most of his testing of A-41 until he had information about Cooper's genetic profile — that is, until he knew what he had to match. He then delayed doing the most sensitive and discriminating tests of A-41 until after Cooper had been arrested and had the vial of Cooper's blood (vial VV-2) in his lab. Without contacting Cooper's counsel, Gregonis re-ran tests that consumed more of the limited sample that constituted A-41. Gregonis then tested a known sample of Cooper's blood side by side on the same testing plate with A-41, but initially denied doing so and represented under oath that he had tested the samples blind. ER 761.

When the results of Gregonis's tests on A-41 were initially inconsistent with Cooper's expert's results for a known sample of Cooper's blood, Gregonis altered his lab notes and claimed that he had misinterpreted his results. ER 747. Here is some of Gregonis's trial testimony:

> Q [by Cooper's attorney]:  Did you change your mind about A-41 after you learned that if your original call was accurate, A-41 couldn't have come from Mr. Cooper?
>
> A [by Gregonis]:   Not immediately, no. But it was after. Yes.

Q: Prior to your learning that if your original call about A-41 was correct, then it couldn't have come from Mr. Cooper, how many times did you testify on the witness stand, under oath, that A-41 was a B and nothing else but a B?

A: It is probably about three times.

Q: And your explanation was that it was a technical fault on your part, you made a mistake?

A: Essentially, yes.

ER 746.

The blood sample in A-41 has had a disturbing pattern of being entirely "consumed" in the testing, and then reappearing in a form that could be subjected to further testing. Gregonis had initially used so much of the limited sample (or so he said) that when the parties finally did joint testing, they were forced to place the remaining tiny flakes of white paint in a liquid solvent to dissolve any remaining blood. The sample was so small that their results were largely inconclusive. All of the chips that had had any traces of blood on them were discarded. ER 722-23; 12/6/84 RT 4543-47; 1/30/85 RT 7380-87. Then, in early July 1984, "just out of curiousity [sic] sake, [Gregonis] . . . open[ed] the [A-41] pillbox and saw a very small quantity of blood remaining." ER 722-24; 12/6/84 RT 4548. The parties tested those remaining small specks of blood in October 1984, and again the results were inconclusive. 12/5/84 RT 4442-45.

In August 1999, Gregonis checked A-41 out of the evidence storage room for one day. ER 1629, 2650-54. When Cooper's post-conviction DNA testing took place in 2002, a "bloodstained paint chip" and "blood dust" had inexplicably, and conveniently, appeared in the A-41 canister. ER 790. The blood on that chip was tested, and Cooper's DNA was found.

The appearance of a blood-stained chip in 2002 is, to say the least, surprising, given that Gregonis had testified at trial that in the October 1984 testing of A-41 they had processed and discarded all of the paint chips with blood on them. ER 722-23.

In the 2004-2005 habeas proceeding, Cooper requested EDTA testing of A-41. Without taking evidence on the feasibility of testing any remaining A-41 for the presence of EDTA, the district court rejected Cooper's request. Dist. Ct., 510 F.3d at 948-50; ER 3467; 6/29/04 RT 209.

### iii.   Pro-Ked Shoeprints

Three matching shoeprints made by a Pro-Ked Dude shoe were critical evidence against Cooper at trial. According to testimony at trial, one was a bloody print found on a crumpled sheet in the master bedroom of the Ryen house. Another print was found on a spa cover at the Ryen house outside the master bedroom. The third print was found in dust on the floor inside the Lease house near a pool table.

I discuss below difficulties with the evidence about whether Cooper was, or could have been, wearing Pro-Ked Dude shoes. For the moment, I am concerned only with the suspicious circumstances under which the shoeprints were purportedly found.

The most suspicious of the shoeprints are the two found at the Ryen house. The most incriminating was the bloody print purportedly found on the crumpled sheet in the master bedroom. At trial, only one person testified that he saw the bloody print while the sheet was still in the bedroom. That person was SBCSD Deputy Duffy. No one else claimed to have seen the bloody print while the sheet was still in the bedroom. However, Deputy Duffy had testified under oath at Cooper's preliminary hearing that he had *not* seen the print in the master bedroom. ER 706, 1557. If Deputy Duffy was tell-

ing the truth at the preliminary hearing, no one saw the bloody print on the sheet while it was in the bedroom. If Deputy Duffy was telling the truth at the preliminary hearing, he lied at trial.

SBCSD Deputies Stockwell and Schecter picked up the crumpled sheet from the master bedroom after 5:20 p.m. on June 5. Neither Deputy Stockwell nor Deputy Schecter noticed the bloody print (if it was, indeed, there) when they picked up the sheet. They folded the sheet and packaged it to take it back to the crime lab for processing. Deputy Stockwell testified at trial that sometime later, in the crime lab, he refolded the sheet so it matched the way it had been crumpled on the floor of the master bedroom. He testified that this brought together the separated parts of a bloody Pro-Ked shoeprint on the sheet, which he was then able to see for the first time. Deputy Stockwell was unable to specify when he made this discovery. ER 708; 11/19/84 RT 3506-07; 11/21/84 RT 3698. Deputy Baird, the manager of the Crime Laboratory where the sheet and the other critical physical evidence was kept, testified at trial that he had matched the newly discovered shoeprint to a Pro-Ked Dude shoe that he already had in the lab. (Recall that it was also Deputy Baird who found the drop of blood, A-41, in the hall in the Ryen house.) Soon after the trial, Deputy Baird was caught stealing heroin from the SBCSD evidence locker for his own use and for distribution to others. ER 1714-16.

The other shoeprint at the Ryen house was on the spa cover outside the master bedroom. That print was discovered after some delay. Several people testified that, even after the print was purportedly discovered, that they had looked at the spa cover and had not seen the print. SBCSD Sergeant Arthur, head of the investigation, testified that he pointed the print out to Deputy Duffy at approximately 2:07 p.m. on June 5, but Deputy Duffy testified that he did not know about the shoeprint until Detective O'Campo pointed it out to him at sunset that day. SBCSD Sergeant Gilmore testified that he did not

see any footwear impressions on the cover on the afternoon of June 5. 12/18/84 RT 5160-63; 11/15/84 RT 3363-64, 3396, 3299. Deputy Smith, who was ordered to sketch all of the shoeprints on the spa cover on the morning of June 8, three days later, testified that she sketched all of the prints that she saw on the spa cover. However, none of her sketches matched the print of a Pro-Ked Dude shoe. An unidentified officer directed her back to the spa cover later on June 8. She then saw a Pro-Ked Dude print that she had not previously seen. 1/22/85 RT 6869, 6871-73, 6878-79.

The spa cover was left out in the open, moved several times, and stepped on by at least one deputy before it was taken into evidence. Then the shoeprint was destroyed, purportedly in a failed effort to lift and preserve the image. 11/15/84 RT 3297-98; 11/19/84 RT 3447-48.

If the shoeprints on the sheet and the spa were planted, it does not matter much whether a matching Pro-Ked Dude shoeprint near the pool table in the Lease house was also planted. It is possible that Cooper was, in fact, wearing Pro-Ked Dude shoes while he was staying at the Lease house. If the print in the Lease house was not planted, this would only mean that the prints in the Ryen house were put on the sheet and the spa cover to match the print that had been found in the Lease house.

But the shoeprint in the Lease house could also have been planted. The day before the Lease house search began and the Pro-Ked Dude shoeprint was discovered, the front door to the house had been left unlocked and other evidence was likely planted in the house. (See the discussion below of the hatchet sheath and jacket button.) 1/29/85 RT 7312. The print in the Lease house was discovered after some delay, after approximately twelve people had walked through the house. 1/23/85 RT 6956-58. Deputy Baird testified that the shoeprint had been "marked off so that it would not be stepped on" by mid-afternoon of June 7. 11/12/84 RT 4760. Deputy Smith, who

arrived at 8 p.m. that day to draw sketches of the prints, testified that nobody had instructed her to sketch the print that turned out to be the Pro-Ked Dude print. Instead, she testified that she discovered that print on her own after first sketching several other prints she was instructed to sketch and then walking around the house to look for more suspicious prints. Contrary to Deputy Baird's testimony, Deputy Smith gave no indication that the Pro-Ked Dude print had been marked off at the time she sketched it. 11/22/85 RT 6864-72.

### iv.   Cigarettes and Tobacco

Cigarette and tobacco evidence presented at trial connected Cooper to the Ryens' white station wagon. Recall that the station wagon was found in a church parking lot in Long Beach, 45 miles west of the Ryen house, seven days after the crime. Recall also that Cooper arrived at a hotel in Tijuana, Mexico, 125 miles south of the Ryen house, at 4:30 p.m. the day after the murders.

Cooper had left evidence in the Lease house that he was rolling his own cigarettes, using prison-issued "Role-Rite" tobacco. Tobacco consistent with Role-Rite was purportedly found on the floor between the front passenger seat and the front passenger door of the Ryens' station wagon. Two cigarette butts were also purportedly found in the car. One appeared to be made with Role-Rite tobacco. The other was a commercial filter cigarette. One of the cigarettes contained evidence that it had been smoked by someone with blood type A (Cooper's blood type, and, according to Gregonis, the blood type of about 40% of the population), but testing before trial did not reveal any further information. ER 748-49.

SBCSD deputies had ample opportunity to plant incriminating cigarette and tobacco evidence in the Ryens' station wagon. Most of the cigarette butts that Cooper left behind in the Lease house were never processed into evidence. ER 894, 834-35. Their whereabouts is unknown. Cooper's own car had

been impounded in Los Angeles after he was imprisoned at CIM on the burglary charge. A hand-rolled cigarette butt recovered from Cooper's car had been taken into evidence, but it disappeared prior to DNA testing. ER 895, 897; 6/23/03 RT 109-10, 113, 134-35. Role-Rite tobacco in a white box was recovered from the closet of the bedroom in the Lease house previously used by Katherine Bilbia ("the Bilbia bedroom"), but it was never weighed or otherwise measured. SBCSD Deputy Mascetti obtained a paper bag of assorted smoking tobaccos from CIM. ER 3185.

When police formally took into custody the station wagon in the church parking lot in Long Beach, the rear door was already unlocked. The cigarette butts and tobacco in the car were not noted in the initial visual inspection of the car. Nor were they noted when the interior of the car was first processed for evidence. They first appear on a handwritten, undated, unsigned list of vehicle contents. ER 806-11, 836-37. Finally, the cigarette and tobacco evidence from the car has a perplexing history much like that of A-41. The paper from the hand-rolled butt supposedly found in the car had supposedly been entirely consumed in testing in 1984. At the time of the testing, the paper was 4 millimeters long. The paper "reappeared" in 2001, just in time for DNA testing. When it reappeared, it had grown to 7 millimeters by 7 millimeters square. ER 978-79, 4947, 3170. Perhaps not coincidentally, the hand-rolled cigarette butt from Cooper's own car had disappeared prior to the DNA testing.

v. The Hatchet Sheath and Button

On June 6, the day after the bodies were discovered, two deputies did a sweep through the Lease house, purportedly to check for possible assailants. During this sweep they were aware that the department had recovered a bloody hatchet from beside the road near the Ryen house, and that it was a suspected murder weapon. However, they did not report finding any evidence in the Lease house. Other deputies returned

the following day to conduct another search. Those deputies discovered a hatchet sheath and a green, blood-stained button in the Bilbia bedroom, in plain view on the floor near the closet. 10/29/84 RT 2732-33; 10/30/84 RT 2838-40, 2846; 10/31/84 RT 2905-08. (The district court erroneously wrote that the deputies found the sheath "*near* the bedroom." Dist. Ct., 510 F.3d at 898 (emphasis added).) The bedroom was virtually empty, which would have made the sheath (and, indeed, the button) very easy to see. The bedroom had no furnishings other than a headboard.

One of the deputies who conducted the initial sweep of the Lease house denied ever setting foot in the Bilbia bedroom, where the other deputies later found the hatchet sheath. However, processing of physical evidence in the Lease house later showed that this was a lie. Several of that deputy's fingerprints were found on the inside of the closet of the Bilbia bedroom where the hatchet sheath and button were found. The deputy's insistence that he had never set foot in the bedroom, the presence of the deputy's fingerprints inside the closet of the bedroom, the failure of the deputy to find the sheath and button in plain view on the floor near the closet, and their "discovery" the next day strongly suggest that the hatchet sheath and button were planted in the Bilbia bedroom.

Further, the button found on the floor of the Bilbia button was green. That means that it came from a green prison-issued jacket. However, Cooper testified that he was wearing a brown or tan prison jacket. 1/2/85 RT 5331, 5355-57; 1/3/85 RT 5567-68. Cooper's testimony was confirmed by Lieutenant Cornelius Shephard, who worked at the prison. On June 2, Lieutenant Shephard was driving near the prison and saw Cooper. He testified that Cooper was wearing "what appeared to be prison jacket and blues." 10/24/84 RT 2388. He was "jogging toward me . . . [and] [h]is hair was in braids. *Id.* at 2389. Lieutenant Shephard's written report stated that Cooper was wearing a jacket that was "brown in color." *Id.* at 2408.

In his testimony at trial, he described Cooper's jacket as "brownish." *Id.*

### b.    Summary

In sum, if EDTA testing shows that Cooper's blood was planted on the tan t-shirt, that showing would greatly increase the likelihood that the State introduced false evidence at trial. Indeed, in my view, the likelihood would then be so strong that the district court would be obliged to find that the State did so.

That evidence at trial was Josh's two recorded interviews in which he stated that he saw a single man or single shadow in the house during the murders; the drop of blood labeled A-41 that Gregonis testified was consistent with Cooper's blood; the bloody Pro-Ked Dude shoeprints found on the sheet in the master bedroom and on the spa cover at the Ryen house (and probably the print found in the Lease house as well); the Roll-Rite cigarettes and tobacco found in the Ryen station wagon in Long Beach; and the hatchet sheath and button found in the Bilbia bedroom in the Lease house.

Even with this evidence, the State's case against Cooper was weak. (I will elaborate on this point below.) Without this evidence, the State would not have been able to obtain a conviction against Cooper. That is, if this evidence was false, Cooper would be able to make a showing of actual innocence under either the standard of *Schlup* or of 28 U.S.C. § 2244(b)(2)(B)(ii).

### B.    *Brady* Claims

Cooper contends that the State violated *Brady* in several respects. The most important of those are (1) the failure to provide Warden Midge Carroll's information that Pro-Ked Dude shoes at the prison were not special prison-issue shoes; (2) the failure to provide the Disposition Report showing that

a Senior Deputy approved the destruction of Lee Furrow's bloody coveralls, and the failure to preserve and make the coveralls available; and (3) the failure to provide SBCSD daily logs showing that an apparently bloody blue shirt had been found, and the failure to preserve and make the shirt available. I consider these contentions in turn.

### 1. The Pro-Ked Dude Shoes

At trial, the prosecution presented evidence that prints made by a Pro-Ked Dude tennis shoe were found on a bloody sheet in the master bedroom in the Ryen house, on the spa cover at the Ryen house, and in the Lease house. To tie those shoeprints to Cooper, the prosecution presented testimony by Michael Newberry, General Merchandise Manager for Pro-Keds Division of Stride Rite Corporation, that the Pro-Ked Dude is "a tennis shoe that is manufactured only for institutions," is "supplied strictly for prison use within the State of California," is "unavailable for retail stores within California," and is not "sold on the street." 10/23/84 RT 2281; 2/7/85 RT 7749, 7752. Newberry testified at trial that to the best of his knowledge the Pro-Ked tennis shoe is not "sold across the counter on a retail basis in any state in this country," and he confirmed that "the only place those shoes arrive, if those arrived in California, is in some type of state facility." 10/29/84 RT 2624, 2621-22.

Shortly before Cooper's scheduled execution in 2004, now-retired Warden Midge Carroll provided a sworn declaration in support of Cooper's motion to file a second or successive federal habeas application. She stated in her declaration, dated January 30, 2004, that after reading newspaper reports during the investigation into the Ryen/Hughes murders in 1983, she had conducted "a personal inquiry of the appropriate staff, including the deputy warden, the business manager responsible for procurement, and the personnel responsible for warehousing," and as a result of that inquiry she had concluded that the investigators' assertion that the shoeprints tied to the

crime scene "likely came only from a prison-issue tennis shoe was inaccurate." *Id.*; *see* ER 1680-82. She stated that she had conveyed this information to the SBCSD, but that the information was not provided to Cooper's trial counsel.

Inmate James Taylor, who worked in the recreation equipment room at the prison, testified at trial that he personally gave Cooper a pair of P.F. Flyer shoes, and then allowed Cooper to trade those shoes in for a pair of Pro-Ked Dude tennis shoes just days before Cooper's escape. ER 1689; 10/25/84 RT 2547-48. However, in a sworn declaration, dated January 8, 2004, submitted in support of Cooper's motion to file a second or successive application, Taylor stated that he had not told the truth at trial. Contrary to his trial testimony, Taylor now stated that he had issued Cooper only one pair of shoes — P.F. Flyers — and that Cooper had not traded the P.F. Flyers in for a pair of Keds or any other shoes. ER 1678-79.

An en banc panel of this court held in 2004 that Warden Carroll's declaration, in combination with inmate Taylor's declaration, was enough to make out a *prima facie* showing of a *Brady* violation. *Cooper*, 358 F.3d at 1121. Based on this *prima facie* showing, the en banc panel granted Cooper permission to file a second or successive federal habeas application.

During the district court hearing in 2004-2005, now-retired Warden Midge Carroll, Stride Rite executive Don Luck, and inmate James Taylor all testified. I discuss their testimony in turn.

### a. Warden Midge Carroll

Warden Midge Carroll testified that in 1983 she was the Warden of CIM, the prison in which Cooper had been incarcerated. At the district court hearing, Carroll testified that during the investigation of the murders, she became concerned that the SBCSD was describing shoeprints found at the scene

as being from "a prison-made tennis shoe, a special shoe that had to come from a prison." She testified that she knew CIM did not have prison-manufactured tennis shoes, and she directed her staff to "look into this special shoe and get back to me." 6/2/04 RT 102. Her staff reported back that "there was no special shoe, that the shoes we had and that we issued were common, ordinary shoes that were commonly manufactured and sold in retail stores." *Id.* at 103-04. Carroll testified that she then called the SBCSD and shared this information with one of two lead detectives, whose name she could not now recall. *Id.* at 104-05. Carroll testified that she "felt a little put off by" the detective's response. *Id.* at 107-08. She testified that she made a couple of additional attempts to contact the SBCSD about the issue, but her calls were not returned. *Id.* at 108-09.

Carroll also testified that there were a few inaccuracies in her January 30, 2004 declaration. For example, she testified that she did not keep records of all of her contacts with the SBCSD about the Cooper case, and that she had not "kept meticulous records of all matters stemming from Mr. Cooper's case, including [her] contacts with detectives." *Id.* at 147, 172. She also testified that she did not keep records of her telephone conversations. *Id.* at 198.

SBCSD Detective Derek Pacifico testified during the district court hearing that he could find no record that Carroll had communicated with the SBCSD. He testified that he had reviewed "all of the files and materials in the custody of the Sheriff's Department relating to the Kevin Cooper case" and could not find "any indication of any contact from Ms. Carroll." 6/3/04 RT 46-47. Detective Pacifico had been with the department only since 1990. On cross-examination, Detective Pacifico conceded that he had not spoken with anyone who had worked on the case in 1983, and did not know more than two names of officers who had been involved with the investigation. *Id.* at 49-50. He also admitted that he was not familiar with the SBCSD paperwork for processing telephone calls in

1983, and he conceded that although the files included the standard pink "missed your call, please call" slips, "I would guess that you wouldn't take a message . . . if someone is live to answer the phone." *Id.* at 53-54.

### b.   Stride Rite Executive Don Luck

Stride Rite executive Don Luck also testified at the district court hearing. Luck had managed the Keds shoe line for forty-one years before his retirement. Luck's testimony directly contradicted Newberry's trial testimony that the Pro-Ked Dude was not "sold across the counter on a retail basis in any state in this country." 10/29/84 RT 2624. Luck stated that no large chains on the West Coast sold Pro-Ked Dudes in the early 1980s, and he stated that the market for Pro-Keds was generally weak in the West. But he testified that Pro-Ked Dudes "enjoyed a good business" in retail stores in New York; that he "did lots of thousands of pairs in the five boroughs of New York"; and that the demand "splash[ed] on down to Atlanta." 6/2/04 RT 239-40. Luck testified that smaller chains and individual stores, including those on the West Coast, could order Pro-Ked Dudes through the wholesale catalog. He also left open the possibility that major chains east of Chicago may have sold Pro-Ked Dudes. He conceded that the Pro Ked Dude sold to institutions was the "[s]ame shoe, same storage, same shipment point" as the Pro Ked Dude sold to retail outlets through the catalog. *Id.* at 239.

Michael Newberry, who had testified as the Stride Rite representative at the 1983 trial, now lives and works in China. The district court initially proposed that the parties conduct a deposition on written interrogatories. 4/2/04 RT 3-4. On May 7, 2004, Cooper's counsel submitted to the court a list of twenty proposed questions for Newberry. ER 127-30. The district court, however, never authorized the deposition on written interrogatories.

### c.   Inmate James Taylor

Inmate James Taylor testified at trial that he had issued Pro-Ked Dudes to Cooper just before his escape. At the 2004-2005 hearing in the district court, Taylor could not provide a version of events contradicting his trial testimony without risking perjury charges.

In early May 1983, Taylor began working in the equipment room of the CIM gym, where he issued athletic shoes and other equipment to inmates, and where he had regular access to television. 10/24/84 RT 2466; 1/28/85 RT 7189-90. Five days after the murders, on June 9, 1983, two SBCSD deputies went to CIM and met with Taylor's supervisor in the gym, correctional officer Alfred Hill. That same day, Taylor had heard news reports that the SBCSD was trying to connect tennis shoes with Kevin Cooper, and that Cooper was the primary suspect. After the SBCSD deputies left, Hill told Taylor that the deputies had been looking into shoe impressions, and that the deputies had specifically mentioned a diamond-shaped pattern. 10/25/84 RT 2507-08, 2524-26; 1/28/85 RT 7199-7201. Taylor went that day to Recreation Supervisor Skip Arjo to report that he had information about Cooper. 10/24/84 RT 2477-78.

On June 10, CIM Investigators Murray and Hernandez conducted a tape-recorded interview with Taylor. In the interview Taylor stated that he knew Cooper from the basketball team and that he had given Cooper both Pro-Ked *and* P.F. Flyer tennis shoes. He stated that "[s]omehow, somewhere or another [Cooper] got them, come up with some Pro Keds." 10/25/84 RT 2555. Murray wrote a two-paragraph report of the interview dated June 12, 1983. The report did not mention that the interview had been tape recorded, nor did the report mention P.F. Flyers. The tape was not transcribed until early December 1983 and was not made available to Cooper's attorneys until well after the beginning of the preliminary hearing. 1/28/85 RT 7183-88.

Taylor's testimony was the only testimony at trial that definitively placed Pro-Keds on Cooper's feet. His testimony was not consistent with that of the correctional officer who provided Cooper with his tennis shoes. Cooper had a medical problem with one of his feet and therefore when he arrived at CIM he obtained a "chrono" which entitled him to wear soft-soled shoes. On May 3, Sidney Mason, a search and escort correctional officer, assisted Cooper with filling the chrono. Officer Mason testified that he got the shoes from "a Latin officer that worked in . . . Palm Hall." 1/28/85 RT 7175-77, 7181. Officer Mason testified that the officer came out with "the standard issue Keds, hi-top black type tennis shoes" size "either 9's or 10's. I remember asking two sizes in case one size was out." *Id.* at 7175-77. Officer Mason originally told Cooper's investigator, in a tape-recorded statement, that the shoes "had appeared to me to be Keds, a black and white high top type" and that "I do believe they were used because that would be all that they issued at that time that they had on hand." *Id.* at 7178-79; 1/29/85 RT 7318; 2/7/85 RT 7805. At trial, however, Officer Mason testified that the shoes were new because they were in a box. 1/28/85 RT 7178-80.

Cooper's testimony was consistent with Officer Mason's, except that Cooper consistently maintained that the shoes he was given were old. 1/2/85 RT 5332-41. Cooper testified that he did not know what type of tennis shoes they were. Cooper testified that it was "safe to say" that he was "not paying attention to the shoes at that particular time." 1/3/85 RT 5553.

Taylor's testimony was critical to Cooper's conviction. On March 7, 1985, a CIM internal investigator recommended to Warden Carroll that Taylor be given a reduction in his sentence based on his "testimony [that] implicated Mr. Cooper in the Chino Hills murders." ER 376-77. On March 11, District Attorney Kottmeier wrote a supporting letter to Daniel McCarthy of the California Department of Corrections stating that "Mr. Taylor's testimony [that he had given Cooper a pair of shoes that were available only at institutions such as CIM]

was of critical importance both at the preliminary hearing and at the jury trial." ER 5605-06. In affirming Cooper's conviction on direct appeal, the California Supreme Court specifically referred to Taylor's testimony that he gave Cooper a pair of Pro-Ked Dude shoes shortly before his escape from prison. *Cooper*, 53 Cal. 3d at 797-98.

Taylor's statements during the district court habeas proceedings have been incoherent. State investigators Derek Pacifico and Don Mahoney conducted a tape-recorded interview of Taylor on April 1, 2004, at Ironwood State Prison. FER 22-48. At various times during that interview, Taylor stated that Pro-Keds and P.F. Flyers are the same shoe, that P.F. Flyers are a particular model of Pro-Keds, that P.F. Flyers and Pro-Keds are different shoes, that P.F. Flyers are prison-made shoes, and that prison-made shoes are not called P.F. Flyers. By the end of the interview, Taylor's story was that in the morning he gave Cooper a pair of P.F. Flyers, which are also known as standard prison-issue shoes, and that later in the day he allowed Cooper to exchange those shoes for Pro-Keds. He stated that if he could change anything in his sworn affidavit of January 8, 2004 (I quote this so that the reader can get the full flavor of Taylor's incoherence), he would "distinguish the fact of what I mean right here . . . that I gave him a pair of pf flyers the pro keds pf flyer pro keds not the pf flyer not the pro keds ah the pf flyer prison issue." FER 47.

Taylor testified in the district court on June 2, 2004. He testified that P.F. Flyer shoes are an "everyday, recreational situation shoe" that was "an institutional-made shoe" also known as "PIA tennis shoes." 6/2/04 RT 3-4. He testified that Pro-Keds, by contrast, were "specifically for the [basketball] team," and were "a better shoe." *Id.* at 3. He stated that he did not "understand that the [January 8, 2004] declaration stated that the only shoes that [he] ever provided to Kevin Cooper were P.F. Flyers." *Id.* at 8. He testified that he signed the declaration that described the shoes as P.F. Flyers because, "The

lango — that's what I was trying to — that's the only discrepancy that — from what I said 20 years ago to what I'm saying now to what I told her. These are also called P.F. Flyers. They're — the Pro Ked P.F. Flyers — they're — that's just what they're called. It's a lango." *Id.* at 12-13. As he was saying these words, he was pointing to a photograph of actual P.F. Flyers, not prison-manufactured shoes and not Pro-Keds. *Id.* at 13; ER 427.

Taylor testified in the district court that the statements in his January 8, 2004, declaration had not been written on the paper when he signed it, and when he initialed each line. 6/2/04 RT at 34-35, 56-58, 69. The following day, Sandra Coke, the private investigator who took Taylor's declaration, testified that she had been very careful in ensuring that the contents of the declaration accurately reflected what Taylor intended to say. She testified that she wrote the declaration by hand in Taylor's presence, reviewing each line with Taylor as she wrote it. She denied that Taylor had ever claimed that he sometimes referred to Pro-Keds as P.F. Flyers or that the term P.F. Flyers referred to a prison-made tennis shoe. She further testified that she again met with Taylor approximately two months after the initial interview, when she showed him the declaration and informed him that he would likely be called upon to testify. She stated that Taylor reread the declaration and stated that "everything was accurate and that he had no changes, that he was satisfied with the declaration as it was written." 6/3/04 RT 92-99, 111.

#### d. District Court Conclusion

The district court concluded that the failure to provide Warden Carroll's information to Cooper was not a material *Brady* violation. First, the court wrote that Don Luck's testimony (which contradicted Newberry's testimony) "would not change the inculpatory nature of the shoeprint evidence. . . . [I]t was never assumed that the distribution of the shoes was limited to prison inmates; what mattered was that the shoes

were linked to Petitioner." Dist. Ct., 510 F.3d at 979. Second, the court wrote that "Mr. Taylor's credible testimony at the evidentiary hearing corroborates his trial testimony that he gave Petitioner a pair of Pro-Keds Dude tennis shoes, which Mr. Taylor correctly identified by sight, and that Petitioner never returned those shoes. Mr. Taylor was simply confused by his interview with [Cooper's] investigator[.] . . . [T]he Court concludes therefore that there was no recantation by Mr. Taylor and that Petitioner had a pair of Pro-Keds Dude tennis shoes when he escaped from CIM." *Id.* at 978.

The district court was wrong on both counts. First, the district misstates the evidence at trial. That the distribution of Pro-Ked Dudes was "limited to prison inmates" was not "never assumed." Quite the contrary — it was "assumed"; indeed, it was shown by uncontradicted testimony of Stride Rite executive Michael Newberry. Newberry's testimony effectively eliminated the possibility that the shoeprints on the bloody sheet in the master bedroom and on the spa cover could have come from anyone other than an escaped prisoner. The California Supreme Court specifically relied on Newberry's testimony in affirming Cooper's conviction and death sentence. It wrote:

> The Stride Rite Corporation sells Pro Ked tennis shoes to the state for use in institutions such as CIM. All "Dude" tennis shoes contain the same sole pattern. The general merchandise manager for Stride Rite testified that this pattern is not found on any other shoe that the company manufactures nor, to his knowledge (which was extensive), on any other shoe. The shoes are not sold retail, but only to states and the federal government.

*Cooper*, 53 Cal. 3d at 798.

Second, Taylor did not give "credible testimony corroborat[ing] his trial testimony." Rather, at the district court

hearing Taylor gave a combination of incoherent and flatly incredible testimony. Nor did Taylor "correctly identif[y]" Pro Ked Dudes "by sight." Quite the contrary — during his testimony, he pointed at P.F. Flyers and said that they were Pro Ked Dudes.

It is still possible that Cooper received Pro-Ked Dudes from Officer Mason. But neither Officer Mason nor Cooper can say for certain whether those shoes were, or were not, Pro-Ked Dudes. The *Brady* evidence from Warden Carroll, the testimony of Don Luck, as well as Taylor's obvious lack of credibility, substantially increase the probability that Cooper was not wearing Pro Ked Dudes during the time he was in the Lease house.

### 2.   The Bloody Coveralls

As described in detail above, Lee Furrow's bloody coveralls were important evidence indicating that Furrow and two or three others may have been the killers. Diana Roper turned over the coveralls to SBCSD Deputy Eckley on June 9, 1983. At that time, she told him that she had reason to believe that Furrow had committed the murders. Deputy Eckley logged the coveralls into evidence at the Yucaipa Station of SBCSD. Less than six months later, Deputy Eckley destroyed the coveralls without telling Cooper's counsel.

Deputy Eckley testified at trial that he acted alone in discarding the bloody coveralls, and that in so doing he failed to follow SBCSD procedures for disposing of property. ER 4985-89. On December 1, 1998, Cooper's investigator discovered a Disposition Report for the coveralls dated December 1, 1983. This report had not previously been disclosed to Cooper. ER 3010, 4934. The report stated "destroyed no value coveralls." The initials "KS" were written on the bottom right side of the report. In February 1999, Cooper's investigator learned that "KS" was likely to have been Ken Schreckengost, a now-retired Senior Deputy in the property division of

SBCSD. The investigator contacted Deputy Schreckengost, but Schreckengost refused to speak with him. Schreckengost told him, "I don't like [Cooper]. I won't help him," and hung up the phone. ER 3113. Schreckengost told a second investigator, "I know everybody who worked the case, I know all about it but I'm not going to say nothing. . . . They should have shot that son of a bitch when he escaped." ER 4902.

Deputy Eckley also refused to speak with Cooper's investigators. He told one investigator that he "could not add anything to the information which was written on the disposition report." ER 4917. Eckley told another investigator that he would not "say anything without his attorney, unless he is 'drug into court.' " ER 4939. He added that although he was retired from the SBCSD, "he owed them allegiance." ER 4790.

An investigator for Cooper contacted Deputy Schreckengost in February 2005. This time, perhaps because the investigator was a former police officer, Deputy Schreckengost confirmed that the initials "KS" on the Disposition Report were his. He told the investigator, "If you are trying to help [Cooper], you are in the wrong place." Deputy Schreckengost stated that if proper procedures were followed no property associated with a murder would ever be destroyed, and that property with blood on it would have routinely been tested at least for blood type. ER 4787-89. We now know, based on Deputy Schreckengost's 2005 statement, that, contrary to Eckley's testimony at trial, Eckley did not discard the coveralls on his own. Instead, his action had been approved by his superior officer, Deputy Schreckengost. The fact that Deputy Schreckengost had approved the disposal of the bloody coveralls was material information that should have been revealed to Cooper under *Brady*.

This information would have impeached Deputy Eckley's testimony that he acted alone, and would have identified Deputy Schreckengost as the SBCSD officer responsible for the

disposal. The SBCSD's lead investigator testified at trial, based on Deputy Eckley's testimony, that the reason the coveralls were never processed was "neglect." 12/19/84 RT 5261. We now know, based on Deputy Schreckengost's 2005 statement that his initials were on the Disposition Report, that a responsible officer of the SBCSD deliberately destroyed material evidence that should have been provided to Cooper.

If the prosecution had disclosed to Cooper prior to trial that Deputy Schreckengost had authorized the destruction of Furrow's bloody coveralls, his counsel could have questioned him at that time about the circumstances under which he had put his initials on the Disposition Report. More than twenty years later, during the district court hearing in April 2005, Deputy Schreckengost responded "I don't remember," "I don't know," or "I have no idea" more than fifty times. 4/1/05 RT 2-71. He purported not to remember anything about the policy manual or the rules for handling evidence. When asked, "Do you remember anything about signing off on this form?" he replied, "You know I don't. It's been 23 years." *Id.* at 31.

Deputy Schreckengost and Deputy Eckley are good friends. ER 4788. They rode to the district court hearing together. Both of them understood the value of a fading memory. In response to one question during the hearing in the district court, Deputy Schreckengost replied, "You're talking about stuff that happened many years ago. I can't remember what I had for lunch yesterday." 4/1/05 RT 68. When his turn came, Deputy Eckley similarly testified, "I can't remember what I ate two weeks ago." *Id.* at 103.

In April 2005, Eckley testified in the district court that he had thought the story told by Roper when she gave him the bloody coveralls "was a goofy story." He testified, "So in other words there's holes in the story. When I run it by the supervisors, we don't think the story had much credibility.

But I was told to take [the coveralls] as evidence and pass them on which is what I did." *Id.* at 151.

However, in a May 26, 1984, audiotaped interview with Cooper's investigator, Deputy Eckley said that he believed Roper's story: "She said that this guy had come from prison and that he has a rap for crimes like murder. I would believe that part, because the Kellison girls have a tendency or propensity to marry, live and shack-up with guys from prison." He also stated, "And then with my relationship with the Kellison's/Roper family I know their involvement in crime, as far as committing murders as well as giving up murderers." The investigator asked, "They've done this in the past?" Deputy Eckley replied, "Oh, yeh, they've given very good information on a murder before. One of their sons try to commit murder, tried to kill me once. You know, I know the family. So knowing that what Diana said might have validity to it I called the supervisor. . . . He told me to take the coveralls . . . and place [them] in evidence." ER 5000-01.

One week after this 1984 interview, Deputy Eckley was interviewed by SBCSD Detective Woods, who was eager to learn what Deputy Eckley had said to Cooper's investigator. This conversation, which Deputy Eckley did not know was being recorded, strongly suggests that the SBCSD's plan was to pass off Deputy Eckley's actions as those of an ignorant deputy. Deputy Eckley told Detective Woods:

> [T]he impression that I tried to leave [Cooper's investigator] Forbush with is that I am so low on the Totem pol[e] that homicide could come in there and start a fire and I wouldn't even know it. Okay. [A]nd ah you know I'm just a field patrol officer took the stuff in, put it in evidence and notified my superiors. And whatever homicide and my superiors did I don't really know, I've heard you know from hearsay I understand they were contacted, but I don't know. Okay. And what I think they are going to do, is try

and get me on the stand and put a shadow of doubt on homicide investigation that they did not use this lead. That's what my impression is I don't know if that's true or not.

ER 4932, 4967.

Based on the recently discovered Disposition Report, and on Deputy Schreckengost's 2005 admission his initials were on it, we now know that the prosecution committed two *Brady* violations. First, the prosecution should have turned over to Cooper's attorneys a copy of the Disposition Report. Second, the State should have preserved and made available the coveralls themselves. These two failures severely hampered Cooper's attorneys in their effort to show that Cooper was innocent, and that Lee Furrow and his companions were the true killers.

### 3. Blue Shirt and SBCSD Daily Logs

On June 6, 1983, at 2:41 p.m., a woman unconnected with the investigation, Laurel Epler, called the SBCSD and reported that she had found a blue shirt beside Peyton Road that possibly had blood on it. (Recall that the tan t-shirt was also found beside Peyton Road, which suggests that the killers may have decided to shed some of their bloody clothing at roughly the same time.) SBCSD Deputy Field was dispatched, and he recovered the shirt that day. ER 3703. The State's consistent theory of the case was that Cooper had acted alone. If Cooper could have introduced evidence of a second bloody shirt found beside Peyton Road, this would have been virtually conclusive evidence that there had been more than one killer.

Cooper's trial counsel, David Negus, maintains that he was never given, and never saw, the blue shirt or any document referring to it. At the 2004-2005 hearing in the district court, the State produced SBCSD daily logs that contained a five-

line reference to the blue shirt. The log for June 6 records the following at 14:41 (2:41 p.m.): "On Payton and Glenridge, . . . Laurel Epler reports finding a blue shirt that possibly has blood on it. UNIT 21D14 HANDLING. . . . EVIDENCE PICKED UP." ER 3703. The State contended at the district court hearing that these daily logs were handed over to Cooper's counsel before the 1983 trial. Negus maintains that he was never given the daily logs. However, the district court refused to allow Negus to testify at the 2004-2005 hearing to rebut the State's contention that it had given the logs to him.

It is almost certain that the State did not give the daily logs to Cooper's counsel before trial. District Attorney Kottmeier testified at trial that documents turned over to the defense are stamped with a page number "relating the number of discovery when that page was given to the defense." 1/6/85 RT 6555. The daily logs introduced into evidence at the 2004-2005 hearing have no such page numbers. At the 2004-2005 hearing, Assistant District Attorney Kochis testified that documents obtained by means of a subpoena would not go through the D.A.'s office, and therefore would not have page numbers. 8/13/04 RT 182-84. But the State has been unable to produce any record indicating that the logs were turned over to Cooper's counsel pursuant to subpoena.

Other evidence also indicates that no part of the daily logs was disclosed to Cooper before trial. Evidence that a second shirt stained with blood had been found near the place where another blood-stained shirt had been found, would have critically undermined the prosecution's theory that there was a single assailant. If Negus had had such evidence, he obviously would have used it at trial. Yet there is no mention, at any point during the trial, of a blue shirt, possibly stained with blood, that had been found beside Peyton Road shortly after the murders.

At the 2004-2005 hearing in the district court, the prosecution argued, and the district court concluded, that the blue

shirt found by Laurel Epler was the same shirt as the tan t-shirt recovered by Deputy Field. There is no entry in the SBCSD daily log mentioning the tan t-shirt. The district court relied on this fact to conclude that the one daily log entry mentioning a shirt must correspond to the tan t-shirt. There is absolutely no basis for the district court's conclusion.

The district court disregarded the procedures used by the SBCSD. The daily log, on which Epler's call was recorded, is created based on incoming telephone calls. The call intake person at the SBCSD takes a call, fills out a sheet, and hands that sheet to a dispatcher who then sends a deputy to respond to the call. After the deputy has responded, the dispatcher records the disposition of the call, and the sheet is used to complete the entry in the daily log. *Id.* at 57-59. Laurel Epler called in to report the shirt, and there is therefore an entry in the daily log recording that call. Epler testified in the 2004-2005 district court hearing that she recalled that the shirt was blue and that the location beside Peyton Road where she found the shirt was different from the location where the tan t-shirt was found on the following day. 8/26/04 RT 140-48, 154-55, 161, 165, 187, 201-03.

Deputy Field reported that on the afternoon of June 7, 1983, he participated in a search for physical evidence in the Peyton Road area. He testified that during this search, someone — possibly Sergeant Arthur — brought a tan t-shirt and an orange towel to his attention. Deputy Field took them into custody at 5:30 p.m. that day. ER 908, 2780-81. Because the tan t-shirt was discovered by a SBCSD officer during the course of a search, there was no telephone call to the SBCSD dispatcher about that shirt. There was thus no way that a reference to the tan t-shirt could appear in the daily log.

The district court denied Cooper the opportunity to develop the record to learn whether the SBCSD maintained any records of which documents it handed over to the defense prior to trial. Further, the district court denied Cooper the

opportunity to conduct discovery to learn whether any other documents relating to the blue shirt, such as evidence tags and radio logs, were not disclosed prior to trial. *See* 8/13/04 RT 198-201.

However, even with the record in its current state, it is now clear based on the daily logs that the state has just revealed that there were two shirts, a blue shirt and a tan t-shirt. The prosecution committed a *Brady* violation in not turning over a copy of the SBCSD daily logs that recorded the discovery of the blue shirt. The prosecution committed a further *Brady* violation by not making the blue shirt available to Cooper's attorneys.

### 4. Summary

The en banc panel granted permission to file a second or successive application for habeas corpus based on a *prima facie* showing that the State violated *Brady* in not providing to Cooper Warden Midge Carroll's information about the tennis shoes issued by the prison. Now, after the 2004-2005 district court hearing, we know that there were numerous *Brady* violations. First, the State violated *Brady* by not providing Warden Carroll's information. Second, the State violated *Brady* by not providing a copy of the Disposition Report with Deputy Schreckengost's initials on it, and by not preserving and making available Lee Furrow's bloody coveralls. Third, the State violated *Brady* by not providing a copy of the SBCSD daily logs showing Epler's call reporting that she had found a blue shirt, and by not preserving and making the shirt available.

Given the weakness of the evidence against Cooper, if the State had given Cooper's attorneys this exculpatory evidence it is highly unlikely that Cooper would have been convicted. Thus, based on the State's *Brady* violations, Cooper would be able to make a showing of actual innocence under either the standard of *Schlup* or of 28 U.S.C. § 2244(b)(2)(B)(ii).

### III.   Response to the Concurrence in the Denial of the Petition for Rehearing En Banc

The concurrence in the denial of the petition for rehearing en banc misunderstands the bases for my dissent; makes incorrect and misleading statements about the evidence in the trial record; and mistakenly states that the evidence of Cooper's guilt at trial was "overwhelming."

### A.   Misunderstanding the Bases for the Dissent

The concurrence argues that I am merely rehashing evidence and issues that have long been known to everyone ("from day one"), and that I have "improperly marshal[ed] the facts in the light most favorable to Kevin Cooper." Conc. at 5534. In part, this is a legal argument, contending that Cooper has not satisfied the standard for a second or successive habeas petition under § 28 U.S.C. § 2244(b)(2). In part, this is an argument almost invariably made in long-running criminal cases, contending that so many courts have gone over this case so many times that we can be confident that justice has been done.

On the contrary, there are two important claims, based on newly available evidence, in Cooper's current application for habeas corpus. Both claims satisfy the requirements of § 2244(b)(2). And both claims seriously undermine any confidence that justice has been done.

The first claim is that the State introduced false evidence at trial in violation of *Mooney* and *Napue*. The en banc court directed the district court to test Cooper's blood on the t-shirt for EDTA. The district court flouted that direction. If the EDTA testing had been properly performed, there would likely be important new evidence of evidence tampering by state actors. Even based on the EDTA testing that has so far been performed, there is strong evidence that Cooper's blood was planted. Further, new evidence of evidence tampering

appeared during the district court hearing when it was discovered that vial VV-2, which was supposed to contain only Cooper's blood, contained blood with the DNA of two or more people. The district court refused to acknowledge the significance of this new evidence, and refused to allow any investigation into the circumstances that might have led to the blood of a second person being placed in vial VV-2.

Evidence available from the EDTA testing that has been done so far, and new evidence of evidence tampering connected with vial VV-2, substantially increases the likelihood that the State presented false evidence at trial in violation of *Mooney* and *Napue*. Evidence that would be available if further EDTA testing were performed may well increase that likelihood still further. The false evidence at trial includes Josh's two recorded statements, the State's analysis of the blood contained in A-41, the Pro Ked Dude shoeprints purportedly found in the Ryen and Lease houses, the cigarettes and tobacco purportedly found in the Ryens' station wagon, and the hatchet sheath and button purportedly found in the Bilbia bedroom in the Lease house.

The second claim is that the State failed to reveal exculpatory evidence in violation of *Brady*. Cooper's *Brady* claims based on new evidence are the failure to reveal Warden Carroll's information that the prison issued no shoes to prisoners that were available only in prisons; the failure to turn over the Disposition Report showing that Senior Deputy Schreckengost approved Deputy Eckley's discarding of Lee Furrow's bloody coveralls; and the failure to turn over daily logs showing the SBCSD took into custody a blue shirt that possibly had blood on it, and that there had been a report to the SBCSD shortly after midnight on the night of the murders of a white station wagon with wood sides, carrying three young males. The new evidence showing the second and third *Brady* violations casts new light on what had previously been known — that Deputy Eckley had discarded the bloody coveralls without testing them and without alerting Cooper's attorneys,

and that the SBCSD contended that a bloody blue shirt was never taken into custody. Based on the new evidence, we now know that the failure to make available to Cooper the bloody coveralls and blue shirt were also *Brady* violations.

If either of the above claims is valid, Cooper has a newly available claim of innocence under *Schlup* or 28 U.S.C. § 2244(b)(2)(B). Once such a claim of innocence is properly before the district court, all of the evidence in the record must be considered, including all of the evidence previously known to the parties. *See Carriger*, 132 F.3d at 478. Rather than "improperly marshal[ing] that evidence in the light most favorable to . . . Cooper," I have described that evidence scrupulously and at length.

### B. Incorrect and Misleading Statements

The concurrence makes incorrect and misleading statements about the evidence in the trial record. The statements include the following:

(1)   The concurrence states that Cooper "admitted being [in the Lease house] within an hour of the murders." Conc. at 5541. This statement is incorrect. Sunset on June 4, 1983, was at 7:59 p.m. 1/22/85 RT 6874. Cooper testified that he waited until dark to leave the Lease house, and that he left the house right after finishing a telephone call to his former girlfriend, Diane Williams. 1/7/85 RT 5828-31. Telephone records show that the call to Williams ended at 8:30 p.m. It is impossible to fix a precise time for the murders, but it is likely that they took place quite late that night. The Ryens and their house guest, Chris Hughes, had gone to a barbeque that evening. According to a neighbor, they returned to the house sometime between 9:00 and 9:30 p.m. 10/30/84 RT 2758. Josh recounted that after the return to the house he and Chris stayed awake talking and looking at magazines, while his father stayed up watching television. 12/13/84 RT 4952-54.

Josh recounted that he and Chris were wakened from their sleep.

(2)    The concurrence states that "a bloodstained rope similar to the one in the Ryen's driveway" was found in the Lease house. Conc. at 5541, 5542. This statement is highly misleading. There were two different ropes. One was in the driveway of the Ryen house. The other was in the closet of the Bilbia bedroom in the Lease house. The parties stipulated that "one of the ropes had a center cord and the other did not." 2/5/85 RT 7694.

(3)    The concurrence states that there were "signs of blood in the bathroom." Conc. at 5541. This statement is highly misleading. A large horizontal band on the sides of the shower in the bathroom of the Bilbia bedroom tested positive for Luminol. For reasons explained above, the likely basis for the positive test is the bleach used by Katherine Bilbia in cleaning the shower.

(4)    The concurrence states that there were "hairs consistent with the victims' hair in the drain" in the Lease house. Conc. at 5541. This statement is misleading. The hairs found in the drain were examined only for shape and color. They were never subjected to mitochondrial DNA testing. Further, we know that the Ryen children's maternal grandmother had owned the Lease house a few years before, and that the children had stayed with her in the house. Indeed, Josh specifically testified that he had taken showers in the house. 12/13/84 RT 4934-35.

(5)    The concurrence states that "[t]he prosecution never suggested that Pro-Keds [sic] Dudes were only distributed to prisons." Conc. at 5541. This statement is incorrect. In its opening statement to the jury, the prosecution emphasized that the shoes "were supplied strictly for prison use within the State of California and were unavailable for retail stores within California." 10/23/84 RT 2281. Michael Newberry, a

Stride Rite executive, then testified at trial that Pro Ked
Dudes were sold only to prisons and institutions. In its closing
statement, the prosecution again emphasized that Cooper
wore a "Pro Ked tennis shoe, a tennis shoe that you can't pur-
chase in a store anywhere in this country; a tennis shoe that
is manufactured only for institutions; a tennis shoe such as
this which was sent to state prison in Chino[.]" 2/7/85 RT
7749. It continued, "Mike Newberry knows these aren't sold
on the street." 2/7/85 RT 7752.

(6)   The concurrence states that Cooper "had a prison-
issued jacket with buttons like the button found on the rug in
the bedroom of the Lease house where he stayed." Conc. at
5541. This statement is highly misleading. The problem lies
in its use of the word "like." As explained above, the button
found in plain view near the closet in the Bilbia bedroom was
probably planted by the SBCSD. One of the reasons for
believing that the button was planted was that it was not the
same color as the buttons on Cooper's prison jacket. The but-
ton found in the bedroom was green, and would have come
from a green prison-issued jacket. There was uncontradicted
testimony at trial from Cooper, as well as corroborating testi-
mony from a prison official, that Cooper had a brown or tan
prison jacket.

(7)   The concurrence states that "Cooper's expert agreed
that the person who deposited A-41 on the wall of the hallway
in the Ryen house was African-American." Conc. at 5541.
This statement is highly misleading. Cooper's expert, Dr.
Edward Blake, testified at trial that test results obtained from
blood spot A-41 indicated that blood in the spot came from
someone of African-American descent. 1/30/85 RT 7405,
7409. However, when he so testified Dr. Blake was relying on
tests performed on A-41 by SBCSD criminologist Daniel Gre-
gonis. As discussed above, there is a strong likelihood that
Gregonis falsified the results of those tests. During trial, Coo-
per's counsel forced Gregonis to admit that earlier in the trial

he had repeatedly testified untruthfully about his test results for A-41. ER 746.

### C.  Incorrect Statement that Evidence at Trial of Cooper's Guilt Was "Overwhelming"

The concurrence embraces the opinion of the three-judge panel denying Cooper's application for habeas corpus. Conc. at 5533-34. The last paragraph of that opinion states that the "evidence of Cooper's guilt was overwhelming." *Cooper*, 510 F.3d at 887. This is incorrect. In fact, the evidence of Cooper's guilt at trial was quite weak. That weakness led to a violation of Cooper's constitutional right to due process under *Beck v. Alabama*, 447 U.S. 625 (1980). The evidence against Cooper at trial was so weak that his counsel thought there was a good chance the jury would acquit him outright. The trial judge indicated that, in his view, the evidence merited a second-degree as well as a first-degree murder instruction. He said, just before the end of trial, "Just for you to chew on, it appears to me that we're going to have to have instructions on Murder One and Two but not manslaughter." 1/24/85 RT 7135. He tried to persuade Cooper's attorneys to accept a second degree instruction, saying that omitting a second degree instruction "may well inure to you[r] detriment. They could find first degree, possibly. Otherwise they might only find second degree." 1/28/85 RT 7264.

But because the evidence against Cooper was so weak, Cooper's attorney thought it worth a gamble. In order to eliminate the possibility of a compromise verdict and to increase the chance of acquittal, Cooper's attorneys refused to accept a second degree murder instruction:

> Mr. Negus [Cooper's attorney]: Mr. Cooper and I both agreed that we don't want a second degree instruction. Correct
>
> Mr. Cooper:  That's true.

> The Court:  What this does, among other things, Mr. Cooper, it prevents the jurors from compromising, I suppose.
>
> Mr. Negus:  That's what we don't want. . . . We want them to go on the testimony. It is first degree or it is nothing.

1/28/85 RT 7264. The instructions that went to the jury contained only a first degree murder instruction.

The jury deliberated for seven days before returning a guilty verdict, and deliberated for four more days before returning a death penalty verdict. Many years later, five jurors wrote to Governor Schwarzenegger asking that he grant clemency. One of those jurors wrote:

> There are so many unanswered questions that we may never know. Why did Josh not recognize Mr. Cooper? Why were there no fingerprints found where the evidence showed there should have been? Why wasn't information about the station wagon followed up on? What weren't the three Mexicans located and interviewed? Why with so much blood, was only one drop of Mr. Cooper's blood found? Why did the prosecution cover up evidence? Why was the jury not shown the photograph of Jessica Ryen clutching hair? Why wasn't the hair tested? Why wasn't the jury told about the convicted murderer's bloodied coveralls turned into the police? Why did the police destroy those coveralls? Why wasn't the found beer can ever tested for saliva? These are just some of the many questions I have had over the years.

App. in Suppt. of Mo. to File S. or S. Application, Vol. 7, tab 145.

In *Beck v. Alabama*, the Supreme Court held that due process requires that a lesser-included offense instruction be given in a capital case:

> [W]hen the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting of a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction. *Such a risk cannot be tolerated in a case in which the defendant's life is at stake.*

447 U.S. at 637 (emphasis added). *Beck* requires the trial court to instruct *sua sponte* on a lesser-included offense in a capital case when evidence would support such a verdict. *Clabourne v. Lewis*, 64 F.3d 1373, 1379-80 (9th Cir. 1995).

"Waivers of constitutional rights not only must be voluntary but must be *knowing, intelligent* acts done with sufficient awareness of the relevant circumstances and *likely consequences*." *Brady*, 397 U.S. at 748 (emphasis added). The requirement of a knowing and intelligent waiver extends to *Beck* claims. *Spaziano v. Florida*, 468 U.S. 447, 457 n.6 (1984).

Cooper waived his right under *Beck* to a lesser-included second degree murder instruction only after Negus, his counsel, misinformed him about the law and about the "likely consequences" of foregoing that instruction. At the end of the trial, the judge stated that he was "duty bound" under the law to instruct on second degree murder, despite Cooper's attorney's desire to forgo the instruction. The following open-court colloquy then took place, during which Cooper waived his right to a second degree instruction:

> Mr. Negus (defense counsel): . . . Mr. Cooper and I] have discussed between ourselves that the only role

> that I could see a second degree verdict playing in this particular case is to give a jury a compromise verdict.
>
> I also informed you [*i.e.*, Cooper] that as far as the eligibility for the penalty phase in this particular case is concerned, according to the present law as it is interpreted by—at least by most of the courts, it says in the statute that *a verdict of second degree is the same as a first degree if you find two second degrees, then we're into the penalty phase*. In order not to encourage a compromise verdict, I believe that it is in your best interest to only give the jury two choices: First degree or nothing. Do you agree to do that?
>
> Mr. Cooper: Yes.
>
> The Court: Do you join in the waiver?
>
> Mr. Negus: I certainly do.
>
> The Court: All right, I accept it.

2/5/85 RT 7711-12; ER 260-261 (emphasis added). Thus, Cooper waived his second-degree murder instruction based on his counsel's statement that he was death-eligible whether the jury convicted him of first-degree or second-degree murder.

If Negus had been right about California law, it made sense to waive the second-degree murder instruction. But Negus was wrong. A conviction for second-degree murder can never support the death penalty under California law, no matter how many victims there are. On Cooper's direct appeal, the California Supreme Court acknowledged that his trial counsel's statement of California law was wrong. *Cooper*, 53 Cal. 3d at 828.

Because Cooper was misinformed by his attorney about the consequences of foregoing the second-degree murder instruction, his waiver of his due process right under *Beck* was clearly invalid. Cooper specifically cited *Beck* in his first federal application for habeas corpus. However, the district court failed to mention Cooper's *Beck* claim in denying his first application. On appeal, the three-judge panel of this court rejected his *Beck* claim by a vote of two to one. *Cooper*, 255 F.3d at 1110-11, 1114-15. One of the two judges held that Cooper had failed properly to raise the claim in his application, even though he had specifically cited *Beck*. The other held that he had properly raised the claim, and that his due process rights under *Beck* had been violated, but that the error was harmless. The third judge voted to grant the writ. He would have held that Cooper properly raised his *Beck* claim, that his due process rights under *Beck* had been violated, and that the error was not harmless. An en banc call of the panel's decision failed.

We cannot now go back to revisit our earlier decision on Cooper's due process claim under *Beck*, for it was raised and rejected in his earlier federal habeas application. 28 U.S.C. § 2244(b)(1). But the background of his *Beck* claim, and the fate of that claim, make two things clear. First, contrary to what the concurrence says, the evidence against Cooper at trial was not "overwhelming." On the contrary, it was so weak that it led Cooper's counsel to gamble on getting an outright acquittal. Second, contrary to what the concurrence suggests, there is no way to be confident that justice has been done in this case.

## IV.  Conclusion

Doug, Peggy and Jessica Ryen, and Chris Hughes, were horribly killed. Josh Ryen, the surviving victim, has been traumatized for life. The other members of the Ryen family, and the surviving members of the Hughes family, have also

been traumatized for life. The criminal justice system has made their nightmare even worse.

San Bernardino County Sheriff's Department investigators were confronted with a horrifying multiple murder, far worse than any that had previously occurred in the county. They had an obvious suspect, an escaped prisoner who had stayed for two days at a house 125 yards away from the murder victims. They were under heavy pressure from the news media from the very first moment of their investigation. They drew what seemed, at the beginning, a sensible conclusion — that Kevin Cooper, the escaped prisoner, was the murderer. They drew that conclusion by the end of the first day of their investigation, and from that time forward they organized their investigation around it.

Once SBCSD investigators drew that conclusion, they manipulated and planted evidence in order to convict Cooper. In the course of their investigation, they discounted, disregarded, and discarded evidence pointing to other killers. Their decision to close their eyes early in the investigation to the possibility that someone other than Kevin Cooper might be guilty has led us to the situation in which we find ourselves today.

Unfortunately, the district court made things worse. After our en banc panel granted Cooper permission to file a second habeas application, the district court obstructed and impeded Cooper and his lawyers in almost every way imaginable.

Kevin Cooper has now been on death row for nearly half his life. In my opinion, he is probably innocent of the crimes for which the State of California is about to execute him. If he is innocent, the real killers have escaped. They may kill again. They may already have done so.

We owe it to the victims of this horrible crime, to Kevin Cooper, and to ourselves to get this one right. We should have

taken this case en banc and ordered the district judge to give Cooper the fair hearing he has never had.

---

WARDLAW, Circuit Judge, dissenting from the denial of rehearing en banc, joined by PREGERSON, REINHARDT, THOMAS, and BERZON, Circuit Judges:

Public confidence in the proper administration of the death penalty depends on the integrity of the process followed by the state. *See Furman v. Georgia*, 408 U.S. 238, 299 (1972) (Brennan, J., concurring) ("[I]t is our society that insists upon due process of law to the end that no person will be unjustly put to death, thus ensuring that many more of those sentences will not be carried out."). So far as due process is concerned, twenty-four years of flawed proceedings are as good as no proceedings at all.

We authorized Kevin Cooper to file his second or successive habeas petition so that the district court could resolve the problem so ably articulated by Judge Silverman: "Cooper is either guilty as sin or he was framed by the police. There is no middle ground." *Cooper v. Woodford*, 358 F.3d 1117, 1124 (9th Cir. 2004) (en banc) (Silverman, J., concurring in part and dissenting in part). Instead, through a series of errors accurately described by Judge Fletcher in his dissent, the district court precluded Cooper from having his last day in court. As Judge Fletcher states, the district court "imposed unreasonable conditions on the testing the en banc court directed; refused discovery that should have been available as a matter of course; limited testimony that should not have been limited; and found facts unreasonably, based on a truncated and distorted record." Fletcher Dissent at 5433.

Because of the district court's erroneous rulings and failure to follow the express direction of our en banc court, regrettably, we still do not know the answer to Judge Silverman's

query. *See also Cooper v. Brown*, 510 F.3d 870, 1004 (9th Cir. 2007) (McKeown, J., concurring) ("I . . . am troubled that we cannot, in Kevin Cooper's words, resolve the question of his guilt 'once and for all.' "). Granting rehearing en banc and remanding for a full and fair evidentiary hearing may not have resolved the question of guilt or innocence, but it most certainly would have given us confidence that Cooper received his due opportunity to prove the innocence he has insisted upon since his arrest. I therefore respectfully dissent from the denial of rehearing en banc.

---

FISHER, Circuit Judge, dissenting from denial of rehearing en banc, joined by KOZINSKI, Chief Judge, PREGERSON, GRABER and BERZON, Circuit Judges:

I generally agree with Judge Fletcher that we should have taken this case en banc to require the factual inquiry the previous en banc court expected to occur.

---

REINHARDT, Circuit Judge, dissenting from the denial of rehearing en banc:

I concur in Judge Fletcher's thorough and highly persuasive dissent, as well as in Judge Wardlaw's pithy summary of the judicial failures that infect this case. I would add, however, that the failures are not solely those of the district court. Our own handling of the matter, some of which has been made public and some of which has not, leaves much to be desired, and is a cause of considerable regret. There is no purpose, however, to looking backward at this point. What matters is that we have an obligation to afford Kevin Cooper a full and fair judicial hearing, and that once again we fail. By denying en banc review, we add to the prior systemic judicial malfunctions, and this time, we do so under a cloak of secrecy.

I have on numerous occasions urged that we disclose the names of judges who vote for and against rehearing cases en banc. *Spears v. Stewart*, 283 F.3d 992, 997 (9th Cir. 2002) (Reinhardt, J., dissenting from denial of en banc review); *In re Silicon Graphics Inc. Securities Litigations*, 195 F.3d 521, 523-24 (9th Cir. 1999) (Reinhardt, J., dissenting from denial of en banc review); *United States v. Koon*, 45 F.3d 1303, 1308-10 (9th Cir. 1995) (Reinhardt, J., dissenting from denial of en banc review); *Brewer v. Lewis*, 997 F.2d 550, 556 (9th Cir. 1993) (Reinhardt, J., dissenting from denial of en banc review); *Elder v. Holloway*, 984 F.2d 991, 1001 (9th Cir. 1993) (Reinhardt, J., dissenting from denial of en banc review); *Harris v. Vasquez*, 949 F.2d 1497, 1539-40 (9th Cir. 1990) (Reinhardt, J., dissenting from denial of en banc review). Here, once again, the vote is extremely close, closer than the list of dissenters would suggest. I believe that as judges we have an obligation to let the public know how we vote on critical issues. The public, the legal academy, our colleagues on other courts, and appointing authorities have a right to judge *us* based on our performance on the bench. In this case, in particular, I believe that public disclosure is important. Revealing how we voted would provide information that would be of interest to those who follow the course of our circuit law and who have drawn certain assumptions about the jurisprudence of various judges that sometimes are unwarranted. Most important, this is a case in which a man's life is at stake. Kevin Cooper may or may not be guilty, but serious flaws in our legal system have been exposed. Whether to go en banc or not is a matter of judicial discretion. An en banc review by our court would surely do no harm. Nor would revealing the names of those who agree and disagree with affording this capital defendant a final protection before sending him on his way to execution by the state.

---

RYMER, Circuit Judge, concurring:

I concur in the court's order declining to rehear this case en banc. The panel opinion explains why we affirmed denial of

the writ, *Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007) (*Cooper IV*), so I write now only to highlight the main reasons I agree with the court's decision and not the dissents from failure to take the case en banc. I take particular issue with Judge Fletcher's dissent because:

1. The dissent improperly marshals the facts in the light most favorable to Kevin Cooper, yet the evidence was resolved against Cooper at trial — after he took the stand and testified — and at each step of post-conviction proceedings. The dissent also approaches the issues as if they were new, yet the same issues have been on the table since day one (except for DNA testing which didn't exist at the time and which has turned out to be inculpatory). This includes Josh Ryen's statements; handling the drop of blood A-41; the presence of three strangers at the Canyon Corral Bar; that three white men were seen driving on the road leading away from the Ryen house; Cooper's tennis shoes and whether they were Pro-Keds Dudes or left the impressions made at the Lease house as well as at and near the Ryen house; the bloody coveralls that were linked to Lee Furrow and were destroyed by law enforcement; where in the Lease house the hatchet sheath was found; whose blood was on a tan T-shirt found along the road; cigarette butts in the Ryen station wagon that were linked to Cooper; if there were a blue shirt and what happened to it; and police incompetence, mishandling of evidence, and chain of custody problems. All were known at the time of trial and have been litigated in one forum or another, unfavorably to Cooper, for the last 24 years.

2. The dissent ignores the rules that Congress established for federal habeas review of state criminal judgments in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Cooper's petition is a successive federal habeas corpus application that was preceded by appeals through the California courts, post-conviction petitions in state and federal court, and evidentiary hearings in both state and federal court.[1]

(Text continued on page 5536)

---

[1] Cooper's February 19, 1985 judgment of conviction, and sentence to death on May 15, 1985, was affirmed by the California Supreme Court.

*People v. Cooper*, 53 Cal.3d 771, 837, 281 Cal.Rptr. 90, 129 (1991). The United States Supreme Court denied a petition for certiorari, *Cooper v. California*, 502 U.S. 1016 (1991). Cooper's first federal application, subsequently amended and supplemented, was filed August 11, 1994, and denied August 25, 1997 following an evidentiary hearing. 92-CV-427, Doc. No. 165. We affirmed, *Cooper v. Calderon*, 255 F.3d 1104 (9th Cir. 2001) (*Cooper I*); denied Cooper's PFR/PRFEB; and his petition for a writ of certiorari was denied, 537 U.S. 861 (2002). Cooper filed a second federal application on April 20, 1998 raising a claim related to the Koon statement, which we construed as an application for authorization to file a second or successive petition, and denied. *Cooper v. Calderon*, 274 F.3d 1270 (9th Cir. 2001) (*Cooper II*). Cooper sought to file another successor application that involved DNA testing and tampering, which we denied, *Cooper v. Calderon*, No. 99-71430 (9th Cir. Feb. 14, 2003, April 7, 2003) (orders noting that DNA tests to which the state and Cooper agreed do not exculpate him, nor were there newly discovered facts establishing his innocence, and denying PFR based on asserted deficiencies in the testing and tampering). Meanwhile, Cooper filed seven petitions in the California Supreme Court together with a writ of mandate and various motions, a habeas petition in the San Diego County Superior Court, and six other petitions for a writ of certiorari in the United States Supreme Court as well as two petitions for habeas corpus, each of which was denied. On October 22, 2002 Cooper filed a motion for mitochondrial DNA testing of hairs, and on June 16, 2003 for testing of the tan T-shirt, to show tampering. These were denied following an evidentiary hearing in the state court that found no tampering. Another petition in the California Supreme Court raised essentially the same claims as asserted in this application: actual innocence, tampering with evidence, failure to disclose exculpatory evidence, offering unreliable eye witness testimony of Josh Ryen, and denying Cooper effective assistance of counsel during post-conviction DNA proceedings; the supreme court denied all claims on the merits on February 5, 2004, and also denied as untimely those having to do with evidence tampering, failure to disclose exculpatory evidence, submission of false testimony to the jury, and offering Joshua Ryen's unreliable testimony. On February 6, 2004, Cooper filed another application to file a successive application, which was initially denied, *Cooper v. Woodford*, 357 F.3d 1019 (9th Cir. 2004), *withdrawn*, 357 F.3d 1054 (Editor's Note Feb. 8, 2004), but was later granted when this court reheard the application en banc, *Cooper v. Woodford*, 358 F.3d 1054, 1117 (9th Cir. 2004) (*Cooper III*). As authorized by *Cooper III*, Cooper filed his third application in the district court April 2, 2004. The district court held an evidentiary hearing

At this stage, AEDPA requires federal courts to presume that factual determinations by state courts are correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).[2] This applies to determinations adverse to Cooper on police tampering with A-41 and cigarette butts, the presence of three men at the Canyon Corral, and tampering with the tan T-shirt. AEDPA also precludes federal courts from granting habeas relief when a state court has adjudicated the merits of a claim raised in a federal petition and the state court's adjudication is neither contrary to, nor an unreasonable application of, federal law as determined by the United States Supreme Court. § 2254(d).[3] This applies to state court determinations on Cooper's claim of actual innocence, evidence tampering, Josh Ryen's statements, destruction of the bloody coveralls, the blue shirt, and failure to disclose exculpatory evidence.

---

at which 42 witnesses testified, and denied the writ. *See Cooper IV*, Appendix A. It is this ruling that is the subject of this appeal.

[2]All references are to Title 28 of the U.S. Code Section 2254(e)(1) provides:

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

[3]Section 2254(d) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA further provides that federal courts must dismiss claims that the petitioner has presented in a prior application. § 2244(b)(1).[4] This includes handling of A-41; the Koon statement; destruction of the bloody coveralls; and planting evidence, or manipulating tests, on cigarette butts. AEDPA likewise requires dismissal of claims for which the factual predicate could have been discovered before and that, if proved and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the petitioner guilty of the underlying offense. § 2244(b)(2)(B)(i)-(ii).[5] This includes the blue shirt and daily log; cigarette butts and their testing; Josh Ryen's statements; the three men at the Canyon Corral; Lee Furrow and the bloody coveralls; destruction of the coveralls; and the hatchet sheath.[6]

---

[4]Section 2244(b)(1) provides:

(b)(1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

[5]Section 2244(b)(2) provides:

(b)(2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

[6] Even if *Schlup v. Delo*, 513 U.S. 298 (1998), rather than AEDPA, applies to actual innocence for purposes of gateway claims, the question

As the dissent pays no attention, and gives no deference, to state court determinations, and reaches the merits of claims without regard to whether AEDPA mandates their dismissal, the picture it paints is quite different from the canvas that is actually before us.

3.    In lieu of AEDPA, the dissent starts with the false premise that the district court "flouted" this court's "direction" (in our en banc opinion authorizing Cooper to file his successive habeas application) to perform EDTA and mitochondrial DNA testing.[7] The district court did no such thing;

---

would be whether, in light of all the evidence, including reliable new evidence, it is more likely than not that no reasonable juror would have found Cooper guilty beyond a reasonable doubt. Following an evidentiary hearing the district court found that, to the extent there was new evidence, it was incredible, unreliable or unpersuasive with respect to all claims in the petition, that neither EDTA nor mitochondrial DNA tests showed innocence or undermined evidence of Cooper's guilt, and that the showing of actual innocence was insufficient to avoid procedural bars. The evidence supports these findings, therefore Cooper cannot pass through to other claims by means of either § 2244(b)(2)(B)(i)-(ii), or *Schlup*.

[7]*Cooper III*, 358 F.3d at 1124. Having noted Cooper's position that the question of his innocence could be answered "once and for all" by mitochondrial testing of blond hairs in Jessica Ryen's hands and testing for the presence of the preservative agent EDTA on the tan t-shirt, *Cooper III* also observed: "The district court may be in a position to resolve this case very quickly. As soon as Cooper's application is filed, it should promptly order that these two tests be performed in order to evaluate Cooper's claim of innocence." *Id.*

Given the posture of the case as it was before the en banc panel, however, I disagree with the dissent's implicit assumption that this court *could* have "directed" the district court to conduct the two tests. The only issue before the en banc panel was whether Cooper should be allowed to file a successive application for habeas corpus under AEDPA. 28 U.S.C. § 2244(b)(3)(A); *Cooper III*, 358 F.3d at 1123 ("We hold only that Cooper has made out a prima facie case that entitles him to file a second or successive application."). Once this court authorized the application to be filed, it was up to the *district court* to decide in the first instance whether any of the claims — including those involving EDTA and mitochondrial DNA testing — could go forward, and how to deal with them. *See* 28 U.S.C. § 2244(b)(4). Its decision is, of course, subject to appeal and those issues are now properly before us. But our review is guided by AEDPA, not by a mistaken assumption about the scope of our prior mandate.

it did precisely what *Cooper III* suggested that it do. Between April 2, 2004 (when Cooper filed his application pursuant to our authorization) and April 1, 2005, the district court held a tutorial on testing for the presence of EDTA,[7] requested submissions on a variety of testing-related issues which the parties provided after consulting with their experts, participated in numerous hearings and conferences over a three-month period to develop a protocol, ordered the two tests to be conducted, resolved problems that came up during the process, analyzed the results, and issued a thoughtful 159-page ruling that discusses in meticulous detail all aspects of the testing as well as each claim in Cooper's petition.

4. The district court did the job it was required to do under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) — determine whether EDTA testing is scientifically valid. The district court concluded that the analysis by Cooper's expert did not pass muster. There is no evidence that the methodology Cooper's expert espoused has been, or can be, tested. No other scientists regularly perform this kind of testing. There are no industry standards regarding proper testing protocol, and we have no idea how the history of each specimen's exposure to environmental EDTA will affect the sample and, in turn, the testing. There is no "normal" base level of EDTA. EDTA testing has only been offered to courts on two occasions, and in the one proceeding in which it was challenged, Cooper's expert was involved and both his qualification, and his EDTA testing, were rejected as biased and flawed. Thus, the district court appropriately exercised its gate-keeping discretion to exclude EDTA testing as unreliable. The effect is to leave the state superior court's factual finding (following an evidentiary hearing) — that there was no tampering or contamination by law enforcement officers — un-refuted.

---

[7]As the dissent focuses only on EDTA testing, so do I.

The Supreme Court has made it abundantly clear that this court may not set aside a district court's factual findings unless those findings are clearly erroneous. *Knowles v. Mirzayance*, No. 07-1315, __ S.Ct. __, __U.S. __, 2009 WL 746274 (March 24, 2009), at \*10; Fed. R. Civ. P. 52(a). The dissent, however, assesses the EDTA evidence from scratch (including evidence that was withdrawn), and substitutes its own findings for those of the district judge — based on charts and graphs and regression analyses that *it* has crafted. No court, let alone this court on appellate review, may consider evidence that an expert does not stand behind, nor may we reject a district court's findings of fact — informed by the record before that court — by manipulating data in a way that appears better and brighter to us.

In short, there is no reliable evidence of tampering.

5.   In asserting that "[t]he State of California may be about to execute an innocent man," the dissent neglects to acknowledge the evidence tying Cooper to the murders, or the fact that, after all the testing that has been done post-conviction, no forensic evidence suggests that anyone else was at the scene of the crime or was the killer.

Cooper testified at trial. He told an implausible story about what he did at the Lease house and how he left for Mexico. The jury disbelieved him. The defense theory (then as now) was that there were multiple assailants and police incompetence. Josh Ryen's ambivalent recollections, the presence of three Caucasian men at the Canyon Corral Bar, that three Hispanics were at the ranch before the murders, that three white men were seen driving down the road from the Ryen house, how the blood spot A-41 was handled (or mishandled), the bloody coveralls that were destroyed, the possible involvement of Koon or Lee Furrow, the possibility of an Aryan Brotherhood hit gone awry, the tan T-shirt, and a blue shirt that was logged in but not located, were all known at the time of trial. The jury rejected evidence pointing to other killers.

No one else has ever been connected to the Lease house — where Cooper admitted being within an hour of the murders — and where, after the murders, were found a bloodstained rope similar to one in the Ryens' driveway, signs of blood in the bathroom, and hairs consistent with the victims' hair in the drain.

Cooper admitted at trial that he had prison-issued tennis shoes and never said they weren't Pro-Keds Dude, the shoe with a distinctive pattern that was consistent with impressions in both the Lease house and the Ryen house. The prosecution never suggested that Pro-Keds Dudes were only distributed to prisons, which makes both the warden's recollections and inmate Taylor's immaterial; the prosecution's theory was that there was a link between the imprints found at and near the Ryen house and in the Lease house to Cooper, who admitted staying there, did not deny wearing prison-issue shoes, and whose shoe-size fit the prints.

Cooper had a prison-issued jacket with buttons like the button found on the rug in the bedroom of the Lease house where he stayed. Prison-issue tobacco for cigarettes, which Cooper smoked, was found in the Lease house and in the Ryen station wagon, where a hand-rolled butt (and a manufactured butt) consistent with his saliva were found. Hairs and hair fragments in the car were likewise consistent with Cooper's.

Cooper tossed incriminating evidence — including his prison-issued tennis shoes and other prison clothing — overboard into the ocean from the boat on which he got a job in Ensenada after leaving the Lease house. The jury could, and we must presume that it did, infer consciousness of guilt from this conduct. No "other killer" toward whom the dissent says that "evidence points" is African-American. Cooper's expert agreed that the person who deposited A-41 on the wall of the hallway in the Ryen house was African-American. Post-conviction DNA testing, requested by Cooper, inculpates him.

No test on any item has ever pointed to any one else as the killer. This includes, in addition to A-41, tests of blood on the hatchet taken from the Lease house that matched Doug and Jessica Ryen and Chris Hughes; a bloodstained rope found in the Lease bedroom closet that was similar to a bloodstained rope found on the Ryens' driveway; cigarette butts found in the Ryen station wagon and headboard of the bed on which Cooper slept one night in the Lease house; hairs recovered from the Ryen's station wagon; fingerprints in the Lease house; hairs in the sink and shower at the Lease house that were consistent with Jessica's and Doug Ryen's; and the tan T-shirt.

The state courts found no evidence of tampering with respect to the shoe prints, cigarette butts, A-41, or DNA testing. Neither EDTA testing, mitochondrial DNA testing, nor anything else presented at the evidentiary hearing in district court, clearly and convincingly shows otherwise.

For sure, no investigation or trial is perfect. Judge McKeown makes this point in her panel concurrence, *Cooper IV*, 510 F.3d at 1007, yet recognizes that the law demands affirmance. I agree with the full court's decision that this is so.